Argued and submitted May 8, reversed and remanded November 13, 2003

## David H. SEARS
## and Marie E. Sears,
### *Respondents,*

*v.*

## David M. SEARS,
### *Respondent below,*

### *and*
## Linda Marie Sunshine BOSWELL,
### *Appellant.*

## 01-2933; A117631

79 P3d 359

Brandon B. Mayfield argued the cause for appellant. With him on the briefs was Law Office of Brandon Mayfield.

Alan H. Biedermann argued the cause for respondents. With him on the brief was Ouderkirk & Hollen.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

## LINDER, J.

Mother appeals from a judgment awarding custody of her son (AM) to his paternal grandparents. Resolution of mother's appeal requires that we determine whether the trial court awarded custody to grandparents consistently with ORS 109.119. We review the facts *de novo*. ORS 19.415(3); *State v. Wooden*, 184 Or App 537, 540, 57 P3d 583 (2002). Because we conclude that grandparents have not rebutted the statutory presumption that mother acts in the best interest of AM, we reverse.

AM was born on January 1, 1999, when mother was 17 years old and father was 15 years old. Mother and father never married. According to mother, the relationship was "off-and-on the whole time we were together. There were periods where we didn't see each other and periods where we did."

Father never contributed financially. Apparently, during the times that they were together, mother paid the rent and bills. As mother testified,

"[h]e was more like a kid than anything else. He would ask me for the money to go out and do stuff with a friend and ask me for new clothes, buy his clothes and food and anything else just like another kid."

The testimony[1] showed that father has anger management and substance abuse problems. Grandmother, father's mother, testified that father "has anger," and mother indicated that father "has a real bad temper." According to mother, father had punched holes in the doors and walls of one of their apartments, and he had

"gotten in fights with just about all landlords. He cusses people out and, I mean, I've never had a landlord that ever

---

[1] There were two hearings in this case: a hearing concerning the *ex parte* temporary protective order of restraint that the court had issued pursuant to ORS 107.097(2) and the custody hearing. At the end of the custody hearing, the trial court stated that "[t]he evidence in both hearings is before the Court." Grandparents relied on the evidence from both hearings in their closing argument to the trial court, and mother relied on the evidence from both hearings in her brief on appeal. As did the trial court and the parties, we consider the evidence from both hearings.

liked him or anything. I mean, * * * we were staying at some friends of [grandparents] for a little while and they sat down with us and was telling [father] that he should get a job and help out and he got really mad and started cussing at them and ran out of their house after yelling a bunch of cuss words at them and I think they are pretty mad about that."

Mother has seen father "use numerous amounts of drugs. For a while he was selling drugs. He's pretty much constantly on drugs or looking to buy drugs." John Sears, father's brother, also testified that he has seen father use marijuana and has known father to be under the influence of substances that Sears referred to at the custody hearing as crank, acid, and mushrooms. Grandparents testified, however, that they were uncertain whether father has a drug and alcohol problem.

Mother gave birth to another son with father in April 2000. That child was released for adoption.

Mother testified that, during the late spring of 2000, she obtained a restraining order against father "because he was getting really angry, and really violent[.]" In response, mother and father apparently agreed to joint custody of AM in June 2000. Under their agreement, AM was to reside with grandparents for at least three days per week and with mother for the remainder of the week. The agreement also provided that neither mother nor father was obligated to pay child support to the other for a period of one year. Mother testified that she agreed to that arrangement so that father could have supervised visitation with AM. Mother believed that this agreement was legally binding. Apparently, the court eventually dismissed the case concerning the restraining order.

By the end of January 2001, mother and father's relationship ended. In June 2001, grandparents petitioned for custody of AM, and the custody hearing was held in November.[2]

---

[2] After being served with grandparents' petition, father signed a document that stated, in part, "[B]y my signature below, I consent to the immediate entry of a judgment for the relief sought in the Petition for Grandparent Custody, and I waive further appearance in this matter." Father is not a party to this appeal.

When grandparents petitioned for custody in June 2001, AM was approximately two-and-one-half years old and had been regularly living with them for the majority of his life. AM lived with mother for at least the first seven weeks of his life. After that time, grandparents began babysitting AM while mother worked. AM's time with grandparents increased. Eventually, by the time that AM was eight months old, he was regularly living with grandparents.[3] For the most part, mother and father have not contributed financially toward AM's care. Grandmother testified that parenting AM, the same as parenting her own children, involved:

"Getting up at night and feeding him his night bottles, * * * at 2:00 or 3:00 in the morning, maybe, again, at 6:00 in the morning; * * * changing his diaper; giving him baths. When he started teething, * * * making sure he had teething gel on his gums and the baby aspirin; taking him in for his immunizations; just all the things you do with a baby, * * * the same as I did with my own children; make sure he's well. When he had a cold, * * * make sure he had his medicine."

At the time of the custody hearing, grandparents were toilet training AM. In general, grandparents play with AM, read to him, and show him educational videos. AM has a bedroom, toys, and an outdoor play area at grandparents' home.

AM loves grandparents, and they love him. Grandfather described his relationship with AM as

"very strong. I told [mother] and [father] at the time that we would bond with this baby as our own, getting up with him nights, my nights off. I work graveyard. And rocking for the teething and watching him grow. Just—it's almost like giving birth to another child, so the relationship is extremely strong. We told him this repeatedly, the longer we have this child, the stronger this bond is going to grow."

---

[3] There is conflicting evidence concerning when AM began living with grandparents. In this case, the particular date is unimportant. We have found that, by the time AM was eight months old, he was regularly living with grandparents. ORS 109.119(1) requires that grandparents have a "child-parent relationship" with AM. A "child-parent relationship" is defined, in part, as "a relationship that exists or did exist, in whole or in part, within the six months preceding the filing of an action under this section * * *." ORS 109.119(8)(a). Grandparents filed their petition for custody in June 2001. Accordingly, grandparents have established the requisite six-month period.

In sum, grandparents have demonstrated that, for most of AM's life, they have parented him and have provided him with food, clothing, and shelter.[4]

While AM has lived with grandparents, mother has had contact with him. AM has spent time at mother's homes and has had extended visits with several of mother's relatives. Also, mother had some visitation with AM while he was with those relatives. Before mid-June 2001, mother's contact with AM was extremely limited, and there were periods during which mother had no contact with him.[5] After mid-June 2001, however, mother regularly has had AM two days per week. Those ongoing and regular visits continued through the time of the custody hearing in November 2001.

Although AM's contact with mother has been limited, they have developed a relationship. As even grandmother acknowledged, mother loves AM. He calls her "Mom." Kathleen Cherry, mother's mother, testified that her daughter is protective, loving, and sincere and "good in her ways with [AM]" and that mother's one concern is AM's welfare. Mary Troub, mother's aunt with whom AM has spent time, testified that mother has never abused or neglected AM, is patient and loving with him, and "talks to him and teaches him" when he does something wrong. Finally, Karen Blackburn, mother's supervisor at work, observed mother's interactions with AM on several occasions. She testified that mother has come into the store

---

[4] As mother's testimony indicates, beginning in 1999, she allowed the relationship to develop between AM and grandparents because of her need for help as a teenage mother:

"He's spent a lot of time over there. It started out initially like [grandmother] was saying, baby-sitting when I first went back to work and it was—I started work part time and then immediately I got promoted to key holder and I had to go full time and it started being more and more because I was 17 and 18 and because it was really great to have a baby-sitter."

Mother described grandparents' home as "just a place that was safe for him at the time." As mother stated, "It was not like I was planning on leaving him there."

[5] For example, in February 2001, mother and father left town. They did not tell grandparents that they were leaving. After several days, grandparents contacted the sheriff to report mother and father missing. Approximately four days after grandparents made the report, mother returned.

"several times on her days off, brought [AM] in with her. Picked out clothes for him or you know, sometimes they just maybe were shopping in the mall and would come by to say hi. She always keeps [AM] right with her. She's very attentive to him. Does not let him run around the store and be a disruptive child. She is very soft spoken with him, very direct. She doesn't yell at him. She does a wonderful job."

Even though grandparents have encouraged mother to bond with and care for AM, they described four concerns about her ability to parent: (1) mother's alcohol and marijuana use; (2) unsanitary living conditions; (3) an incident in which AM developed a rash; and (4) nonspecific safety concerns. In their petition for custody, grandparents alleged that mother "has significant substance abuse problems involving illicit drugs and alcohol." Sears, father's brother, testified that mother has used alcohol and marijuana. He testified that the last time he saw mother use marijuana was in October 2000. Sears also testified that, in June 2001, mother was drinking while caring for AM.[6] Eric Johnston, one of grandparents' neighbors, went down late one night when mother and father were living in the neighborhood and asked them to be quiet. He observed mother, father, and some of their friends drinking, and he could smell marijuana. Mother acknowledged that she has used alcohol and marijuana but testified that she has never been arrested, charged, or convicted of the possession of drugs, and she does not use drugs or drink around AM.[7]

Grandmother has seen mother "a little tipsy but not falling down drunk." Grandmother has never seen mother use illegal drugs around AM. Mother has not appeared to be under the influence when grandmother has placed AM in

---

[6] Sears testified that, on that occasion in June 2001, mother vomited. When asked whether it was possible that mother "was sick because she had the flu or something other than that," Sears responded, "That contributed to it, I'm sure."

[7] Mother testified that the last time she used marijuana was in January 2001. In its opinion, the trial court credited that testimony based on mother's tone of voice. We give weight to that finding because the court had the opportunity to observe mother's demeanor and listen to her testimony. *See In re Schenck*, 318 Or 402, 420, 870 P2d 185, *cert den*, 513 US 871 (1994) (reasoning that, "on *de novo* review, determinations of credibility are given significant weight when based on the factfinder's perception of a witness's demeanor").

mother's care. Although grandmother testified that she saw "the pot bong in [mother's] trailer," much of grandmother's testimony concerned what others told her about mother, rather than her own personal observations.[8]

Based on the evidence, our findings are consistent with the trial court's findings: Mother has used marijuana and alcohol at some time in the past. However, there is no evidence of drug or alcohol use after June 2001.

In addition to concerns about alcohol and drug use, grandparents were concerned that, when mother and father were living together in an apartment in 2000, the living conditions were unsanitary. Grandfather testified that approximately 20 large bags of garbage accumulated in the kitchen and that, when he brought his truck to help transport the bags to the dumpsters, father filled the "half-ton pickup bed" twice. As to the general condition of the apartment, grandfather testified that "[i]t was more than trash. It was sickening. The couple staying with them had a small child that could not contain their [sic] body fluids, bladder and such. The stench was awful, the smell." Grandfather also testified that grandmother "gave [father] some bug spray to kill the maggots. It was so bad that there were maggots in the kitchen." Mother testified that, at some point when she was living with father, a children's services worker inspected her apartment and "said it was fine." Grandfather further testified that, in the fall of 2001, at which point mother no longer lived with father, he saw no trash in the living room of mother's apartment. Thus, even though the living conditions at mother and father's apartment in 2000 were less than optimal, there is no evidence that, in 2001, the living conditions in mother's apartment were deficient.

Also in 2000, grandmother contacted Children Services Division (CSD)[9] because AM had developed a rash while in mother and father's care. Specifically, grandmother testified:

---

[8] The trial court admitted much of grandmother's testimony concerning what others had told her "for the effect it has on the hearer" and not "for its truth."

[9] We understand the reference to CSD to be a reference to what is now known as the Department of Human Services. For purposes of this opinion, we use the term CSD.

"I had to go to Portland and take care of my daughter for five days. I asked them to watch him. They ran out of diapers and this was the excuse I heard for this. He had such a horrible rash on him. It was so severe up at the top of his legs, all * * * around his little genitalia area. We were handling—everything was such a severe, raw, red rash that he could not even walk. He walked like a robot. His legs were apart and I took this big heavy diaper off him and then I got mad because I had to get this special cream to put all over him to help clear that up. When I got back from Portland to Otis I wanted to know why he had this rash and [father] said they ran out of diapers and they didn't have enough diapers to change him."

According to grandmother, CSD

"asked if I had gone to the doctor and got it documented. I said, no. I cleared it. My daughter had this cream that she had got for yeast infection[s] on babies, a severe type. She had a newborn baby and I used—she gave me that tube and I used it on [AM] and it cleared up so I explained that. They said, well, next time it happens to go to the doctor and get it verified. So nothing has c[o]me out of that. They weren't visited on that one at all."

However, it did not happen again. Grandparents presented no other evidence of similar incidents and did not testify that they contacted CSD on other occasions to express concerns about AM's safety or care.

Nevertheless, grandmother did testify that, in the past, she had had safety concerns about mother's ability to care for AM, but she was uncertain whether those concerns existed at the time of the hearing because she is "not around [mother] too much." The only specific concern that grandmother identified was that, when mother transports AM, she "seat belts him in and takes him home." Grandmother also testified that, during "[t]he times that [she has] gone out there and seen," mother has not used a car seat. Grandfather testified that AM "has to have a car seat. We wouldn't let [AM] go anywhere with just a seat belt." Grandmother acknowledged, however, that she did not know whether mother recently had purchased a car seat. Although we would not condone AM riding in a car without being

restrained in a car seat, the evidence does not support a finding that that circumstance existed at the time of the custody hearing. Nor did grandparents present evidence of any other safety concern that existed at the time of the hearing.

Overall, then, grandparents' concerns about mother's parenting reflect her past circumstances; they do not reflect her circumstances at the time of the custody hearing in November 2001. By that point, mother had experienced significant and positive changes in her life.

By the end of January 2001, mother and father's relationship had ended.[10] Nevertheless, they left town with their friend for several days in February without telling grandparents. Mother returned without father, and she soon began looking for a job and a place to stay.

By the end of February, she began working at an outlet store in Lincoln City and regularly was seeing Jeremiah Bowen.[11] Mother and Bowen stayed with Gail Faulkner, a friend's mother, from the end of February until the end of April. AM spent time with mother during that period; however, mother did not see AM every week.[12]

---

[10] Cherry testified that father had

"[v]ery bad effects on my daughter. She stayed with him longer than she should have. The best thing she did, like I said before, is to get away from him. She's really improved herself."

[11] At the time of the custody hearing, Bowen was 23 years of age and was employed at a leather store earning $7.50 per hour. Mother testified that she was pregnant with Bowen's child and that her expected due date was in January 2002.

[12] Faulkner testified that, during March and April, mother saw AM weekly. The trial court discounted Faulkner's testimony based on two factual findings:

"I discount the *amount* of time [AM] was with [mother] during this time for two reasons: (1) This period represents the *tail end of* [mother's] pregnancy; and (2) [Grandparents] didn't hear from [mother] during the entirety of her pregnancy which is backed up by Exhibit 2, a record found by this court to be reliable. * * * Faulkner's evidence is much like that of [mother's] relatives; *i.e.*, the evidence is either contradicted by other evidence, or finds no corroboration in the remaining trial testimony and evidence."

(Emphasis in original.)

Because our review is *de novo* and the trial court's findings were based on its comparison of Faulkner's testimony with the information in Exhibit 2, one of grandmother's daily logs that documented AM's activities, we need not accept or give weight to those findings. *In re Schenck*, 318 Or at 420-21 (reasoning that, "[t]o the extent * * * that the credibility determination is based on a comparison of the substance of the witnesses' testimony with the substance of other evidence, then this court on *de novo* review is as well equipped as is the [factfinder] to make that record determination").

By the end of April, mother and Bowen had moved into their own apartment.[13] It took mother about a month to get settled and to furnish her apartment. By the end of May, AM spent several nights with mother at the apartment. In June, the month that grandparents filed their petition for custody, mother testified that AM's visits "started becoming more regular every week. We had groceries finally and a little bit of furniture and stuff." Even grandmother testified that, since the petition was filed, mother "takes [AM] two days a week every week."

In addition to increasing her visitation with AM, mother has maintained her job at the outlet store. At the time of the custody hearing, she was an assistant manager earning $10 per hour. Blackburn, mother's supervisor, testified that mother had "already had a substantial raise which is almost unheard of in our company and she is now going to be promoted to a store manager."[14] As store manager, mother would earn between $25,000 and $27,000 per year. According to Blackburn,

> "[mother] is an outstanding employee. She's very hard working. She comes to work on time. She is the best assistant manager I have ever had. I've been in retail sales for over eight years in the mall. She comes to * * * work on time. She's wonderful with other employees. She gives great customer service. She's always in a great mood. She's willing to work any overtime she's asked. I couldn't ask for

We do not accept the trial court's findings for two reasons. First, the trial court found that the term of mother's second pregnancy was from summer 1999 through April 2000. Thus, Faulkner's testimony did not concern the last few months of mother's second pregnancy, contrary to the trial court's recollection. Second, Exhibit 2 covered only the period from May 2001 through July 2001. Thus, that log cannot support the court's finding that grandparents did not hear from mother during the entire period of the pregnancy.

We acknowledge that Exhibit 1, the log covering the period from January 2000 through April 2001, indicates that AM did not spend time with mother during March and April 2001. But, as the trial court recognized, AM may have had contact with mother during those months when he visited his maternal relatives away from grandparents' home. As we have already found, mother saw AM during the time that he was with her relatives.

[13] Apparently, mother and Bowen's relationship was continuing at the time of the custody hearing in November 2001; however, it is unclear whether they are still sharing an apartment.

[14] Mother testified that the promotion was still under consideration and that she had been told that it was likely to occur.

a better assistant manager. * * * I in fact recommended her for the promotion because she's done such an outstanding job."

When asked whether she considers herself to be self-sufficient and able to take care of AM financially, mother responded, "Yes, definitely. I make enough money to pay all my bills and support him too. It's the first time I've had a decent amount of money."

In sum, mother has improved her situation since the relationship with father ended. She has begun regular and ongoing visitation with AM, she has an apartment, and she is maintaining a job.

In its judgment, the trial court awarded custody of AM to grandparents and awarded mother and father reasonable parenting time. In determining that grandparents had rebutted the statutory presumption in ORS 109.119(2)(a) that mother acts in the best interest of AM, the court focused on the strong relationship that had developed between grandparents and AM, mother's limited support of and involvement with AM before grandparents filed their petition, and mother's failure to present evidence to demonstrate that she could care for AM and her child that was due in January 2002. Mother appeals and raises five assignments of error.

■ In her first assignment of error, mother asserts that the 2001 version of ORS 109.119 is facially unconstitutional because "it does not require compelling reasons or [a] clear and convincing standard of proof for an award of custody to third part[ies] over the objection of natural parent[s]." We agree with grandparents that mother's constitutional challenge is not preserved. According to mother, we can and should review her assignment of error because she asserts errors of law apparent on the face of the record. *See* ORAP 5.45. We disagree. The legal points on which mother relies are not obvious and are reasonably in dispute. *See State v. Reyes-Camarena*, 330 Or 431, 435, 7 P3d 522 (2000) (explaining that an appellate court has discretion to review an unpreserved error as plain error if, among other things, the legal error "is obvious, not reasonably in dispute" (internal quotation marks omitted)). Specifically, neither we nor the

Supreme Court has authoritatively decided those issues in the context of the 2001 version of ORS 109.119. Accordingly, we cannot consider mother's first assignment of error.

In her second assignment of error, mother asserts that ORS 109.119, as applied by the trial court, infringed on her federal constitutional right to the care, custody, and control of AM. *See Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000). We need not decide that issue, however, given our resolution of mother's statutory argument. Specifically, in her third assignment of error, mother contends that the grounds for awarding custody of AM to grandparents under ORS 109.119 are not satisfied. As we explain below, on our *de novo* review of the record, we agree. It is therefore unnecessary for us to reach mother's "as applied" constitutional challenge. Accordingly, we turn to mother's third assignment of error.

■ ORS 109.119 governs custody disputes between parents and nonparents.[15] As pertinent to this case, a grandparent who has established a child-parent relationship with a child may petition the appropriate court for custody of the child.[16] ORS 109.119(1); ORS 109.119(3)(a). In such a proceeding, "there is a presumption that the legal parent acts in the best interest of the child."[17] ORS 109.119(2)(a). Another paragraph of the statute provides:

---

[15] Grandparents filed their petition for custody in June 2001, before the effective date of the 2001 amendments to ORS 109.119. In deciding this case, the trial court applied the 2001 version of the statute, and we do the same. *O'Donnell-Lamont and Lamont*, 187 Or App 14, 18, 67 P3d 939, *rev allowed*, 335 Or 655 (2003) (reasoning that the "legislature intended * * * to make the 2001 amendments to ORS 109.119 applicable to all petitions filed before the effective date of the statute").

[16] ORS 109.119(8)(c) defines "grandparent" as "the legal parent of the child's legal parent." ORS 109.119(8)(a) defines a "child-parent relationship" as

"a relationship that exists or did exist, in whole or in part, within the six months preceding the filing of an action under this section, and in which relationship a person having physical custody of a child or residing in the same household as the child supplied, or otherwise made available to the child, food, clothing, shelter and incidental necessaries and provided the child with necessary care, education and discipline, and which relationship continued on a day-to-day basis, through interaction, companionship, interplay and mutuality, that fulfilled the child's psychological needs for a parent as well as the child's physical needs."

[17] ORS 109.119(8)(d) defines a "legal parent" as "a parent as defined in ORS 419A.004 whose rights have not been terminated under ORS 419B.500 to

"If the court determines that a child-parent relationship exists and if the court determines that the presumption described in subsection (2)(a) of this section has been rebutted by a preponderance of the evidence, the court shall grant custody * * * to the person having the child-parent relationship, if to do so is in the best interest of the child."

ORS 109.119(3)(a).

In this appeal, we understand the following: (1) Grandparents are the legal parents of AM's father. *See* ORS 109.119(1); 109.119(8)(c), (d). (2) Grandparents have established a child-parent relationship with AM. *See* ORS 109.119(1); ORS 109.119(8)(a). (3) Mother is the legal parent of AM because she is AM's biological mother and her rights have not been terminated pursuant to ORS 419B.500 to 419B.524. *See* ORS 109.119(8)(d). (4) There is a presumption that mother acts in the best interest of AM. *See* ORS 109.119(2)(a). Thus, the disputed issues under ORS 109.119(3)(a) are whether grandparents have rebutted the statutory presumption in favor of mother by a preponderance of the evidence and, if grandparents have rebutted the presumption, whether awarding them custody is in AM's best interest.

To determine whether grandparents have rebutted the statutory presumption, we turn to ORS 109.119(4)(b), which provides:

"In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award custody, guardianship or other rights over the objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A) The legal parent is unwilling or unable to care adequately for the child;

"(B) The petitioner * * * is or recently has been the child's primary caretaker;

"(C) Circumstances detrimental to the child exist if relief is denied;[18]

---

419B.524." Pursuant to ORS 419A.004(17), the term "parent" includes "the biological * * * mother of the child[.]"

[18] " 'Circumstances detrimental to the child' includes but is not limited to circumstances that may cause psychological, emotional or physical harm to a child." ORS 109.119(8)(b).

"(D)   The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner * * *; or

"(E)   The legal parent has unreasonably denied or limited contact between the child and the petitioner * * *."

Grandparents have demonstrated that, by the time AM was eight months old, they were his primary caretakers. ORS 109.119(4)(b)(B). In that regard, the evidence amply establishes that mother at the least has "fostered" and "encouraged" a strong relationship to develop between AM and grandparents by allowing AM to reside with grandparents and allowing grandparents to provide and care for AM. ORS 109.119(4)(b)(D).

Of significance, however, on our *de novo* review of the record, we are not persuaded that grandparents have demonstrated by a preponderance of the evidence that mother is unable or unwilling to care adequately for AM or that circumstances detrimental to AM exist if they are denied custody.[19] To be sure, the record establishes that, before June 2001, mother had extremely limited contact with AM and generally failed to support AM financially. Of significance, however, mother, who was a teenager during much of that time, developed a relationship with AM and, apparently at times, was supporting father, who was a minor with anger and substance abuse problems.

Mother and father's relationship ended in early 2001. By the time of the custody hearing in November 2001, mother was working and was expecting a promotion to store manager, she had her own apartment, and, most importantly, she was regularly caring for AM two days each week. Mother was expected to give birth to another child a few months after the custody hearing. In caring for two children, mother will face added responsibilities and stresses; however, grandparents did not demonstrate that mother will be unable to care adequately for two children.[20] Further,

---

[19] In this case, the record primarily consists of testimony from mother's family and friends and grandparents' family and friends. There was no expert testimony about the parties' parenting abilities, AM's particular needs, or the effect on AM of a custody award in favor of either party.

[20] The trial court reasoned that grandparents had rebutted the statutory presumption because of mother's past conduct and *her* failure to demonstrate that she

although grandparents did present evidence about (1) mother's alcohol and marijuana use; (2) unsanitary living conditions; (3) an incident in which AM developed a rash; and (4) nonspecific safety concerns, that evidence concerned past and generally isolated circumstances. Most importantly, there was no evidence that those circumstances existed at the time of the custody hearing in November 2001. Finally, mother has not unreasonably denied or limited contact between AM and grandparents. ORS 109.119(4)(b)(E). In sum, based on the totality of the circumstances, we are not persuaded on our *de novo* review of the record that grandparents have rebutted, by a preponderance of the evidence, the statutory presumption that mother acts in the best interest of AM. Accordingly, the trial court erred in awarding custody to grandparents.

Because mother is entitled to custody under ORS 109.119, there is no need for us to address further her fourth assignment of error concerning one of the trial court's factual findings about the amount of time that mother spent with AM and her fifth assignment of error concerning the trial court's issuance of a temporary protective order of restraint pursuant to ORS 107.097.

The only remaining issue is the disposition of the judgment on appeal. Grandparents petitioned for custody of AM and requested an order "awarding the custody of the minor child [AM] Sears to [them], with reasonable parenting time to [mother and father]." Father, in effect, consented to the entry of judgment granting the relief requested by grandparents. 190 Or App at 486 n 2. In her response to grandparents' petition, mother requested counter-relief—*i.e.*, an order "awarding [her] sole physical and legal custody of the minor child, with a provision for supervised parenting time by [father]." The trial court's judgment awarded grandparents

---

had a plan for caring for AM and her child that was due in January 2002. That reasoning erroneously places the burden of proof on mother. Under the statute, grandparents have the burden of rebutting the presumption in favor of mother. *See* ORS 109.119(2)(a); ORS 109.119(3)(a); ORS 109.119(4)(b); *see also Austin and Austin*, 185 Or App 720, 727, 62 P3d 413 (2003) (reasoning that the issue in the case was whether the nonparent had rebutted the presumption in favor of the parent). Thus, in determining whether grandparents have rebutted the presumption, we do not consider mother's failure to demonstrate a plan for caring for AM and an infant.

physical and legal custody of AM, awarded mother reasonable parenting time, and awarded father reasonable parenting time subject to certain limitations.

We have determined that the trial court erred in awarding custody to grandparents; thus, its judgment must be reversed. Mother's request for an award of counter-relief, including supervised parenting time to father, remains unresolved. Consequently, the case must be remanded to the trial court.

Reversed and remanded.