Submitted on record and briefs October 3, 2003, affirmed February 11, 2004

Randy WURTELE
and Janet Wurtele,
*Respondents,*

*v.*

Edgar Errin BLEVINS,
*Appellant,*

*and*

Sasha WURTELE,
*Respondent.*

00-3066; A115793

84 P3d 225

132

Edgar Errin Blevins filed the brief *pro se*.

Mark Kramer filed the brief for respondents Randy Wurtele and Janet Wurtele.

Sasha Wurtele filed the brief *pro se*.

Cecil A. Reniche-Smith, Peter Bunch, and Zimmer & Bunch LLC filed the brief for child.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

HASELTON, P. J.

## HASELTON, P. J.

■    Father appeals from a judgment awarding custody of his daughter, K, to her maternal grandparents. We review the facts *de novo* under the standards prescribed in ORS 109.119 and our case law construing and applying that statute. *See, e.g., Sears and Sears*, 190 Or App 483, 79 P3d 359 (2003), *Winczewski and Winczewski*, 188 Or App 667, 72 P3d 1012 (2003), *rev pending* (2004). We conclude that: (1) grandparents rebutted the statutory presumption that father acts in the best interests of his daughter, ORS 109.119(4)(b), ORS 109.119(2)(a); (2) an award of custody to grandparents is in K's best interest, ORS 109.119(3)(a); and (3) constitutionally "compelling circumstances" militate against an award of custody to father in that such an award would expose K to undue psychological injury. Accordingly, we affirm.

K was born on August 16, 1993. At that time, father was 17 years old, and mother was 16. Father and mother, who were unmarried, lived with mother's parents (grandparents) at their home in Clatskanie for the first two months after K's birth and then moved to Tacoma, Washington, where they lived with father's mother, Brecy. In the spring of 1994, mother and K returned to Clatskanie without father, who joined the Job Corps. After living briefly with grandparents, mother moved with K into her own apartment, and father, who had dropped out of the Job Corps, rejoined them in late 1994. During that period, and until early 1996, mother worked outside of the home; father cared for K when mother was at work; and mother and father shared parenting responsibilities at other times.

In late 1995 or early 1996, father returned to Brecy's home in Tacoma, where he was still living at the time of trial. At about the same time, mother moved with K to Longview, Washington. In the spring of 1996, grandmother visited mother's apartment in Longview. Concerned for K's welfare—and with mother agreeing that she was not ready to assume parental responsibilities—grandmother took K back to grandparents' home. K was then two-and-one-half years old, and she has resided with grandparents, at first in Clatskanie and then, later, in Salem, since that time.

Grandparents, acting in a parental role, provided care, nurturing, and security for K. Grandparents taught K, played with her, comforted her, and tucked her in at night. Grandparents, and only grandparents, interacted with K's teachers and took her to the doctor. The relationship between K and grandparents was, and is, very close, warm, and loving. In the words of expert custody evaluator Patricia Cox, that relationship is the "primary bond" in K's life.

Mother, with one exception several years ago, maintained a continuing presence in K's life. Although living separately from grandparents, mother saw K frequently, including after grandparents moved with K to Salem a few months before the trial. Initially, mother acted more as a "big sister" to K, but recently their relationship has changed, with mother assuming a more "parental" role. The relationship between mother and K is affectionate.

Father has also, for the most part, maintained a continuing relationship with K. The parties dispute whether father had any contact with K between late 1995 or early 1996, when he returned to Tacoma, and the spring of 1998, when he attended K's preschool graduation. The more persuasive evidence in the record shows that, even if there was some break in contact when father first returned to Tacoma, he renewed visits with K by no later than the spring of 1997, and, with a break of no more than a few weeks in mid-1999, continued consistent visitation thereafter.

Initially, father came to Clatskanie for day visits, but beginning no later than 1998, K went with father to Tacoma for weekend and holiday visits with his family, staying with father at Brecy's home. In the summer of 1999, K had her first extended visit, a week with father. Father and K had, and have, an affectionate relationship; he would take her on outings, play with her, and, when necessary, discipline her appropriately.[1]

---

[1] One significant exception was an incident at the end of K's one-week visitation with father in the summer of 1999. At that time, father angrily—and, according to mother, obscenely—expressed frustration toward K in K's presence. After that incident, father did not resume visitation for several weeks.

Although father maintained consistent contact with K, his financial contributions toward her support were sporadic. The record is not entirely clear, but it appears that, at various times, including in 1997 and 1998, Washington authorities deducted monies from father's paycheck for child support for K. Father also periodically bought K gifts, including clothes, toys, videos, and computer programs. However, and notwithstanding that he was employed, father—acting on the advice of counsel—made no payments towards K's support after January 2000.

Relations between grandparents and father were generally amicable until shortly before grandparents filed their petition in February 2000. The impetus for the petition was that grandfather wanted to add K to his health insurance policy but could not do so unless grandparents had legal custody of K. In their petition, grandparents alleged:

> "Petitioners have established a child-parent relationship with the minor child, which has existed within the six months preceding the filing of this action, in which the child resided with petitioners and petitioners supplied the child with food, clothing, shelter, and necessaries, and provided the child with necessary care, education, and discipline. Such a relationship has continued on a day-to-day basis through interaction, companionship, interplay, and mutuality, which has fulfilled the child's psychological needs for a parent, as well as the child's physical needs."

Grandparents' petition acknowledged that both mother and father should be awarded reasonable parenting time, including at least one weekend a month for father.

Father opposed grandparents' petition and filed a cross-petition for custody. Father asserted, *inter alia*, that he had "until recently been led to believe that [K] was in the care and custody of [mother], who was living with maternal grandparents until the time of this action." Father further asserted that grandparents "should not be allowed any visitation" with K because of

> "their unfitness as custodian of the child, in that they do not provide adequate care for the child and they engage in certain activities, such as the use of controlled substances and

the practice of the occult which is detrimental to the well-being of the child."

Father also proposed that mother should be allowed only supervised visitation.

Mother filed a response to the petition and cross-petition. She admitted that custody should be awarded to grandparents. Alternatively, she alleged that, if grandparents did not prevail, she should be awarded "sole custody of [K], subject to reasonable and seasonable parenting time" for father.

In February 2000, the court issued a temporary protective order of restraint, maintaining K's residence with grandparents. That order, which was later amended to provide for parenting time with father, remained in effect, with modifications, until the trial in May 2001.

Relations between grandparents and father substantially deteriorated between the filing of the petition and the time of the trial. In December 2000, father, who had found a bruise on K, accused grandparents of whipping K and told grandmother, in K's presence, that he had talked to child protective services. Grandparents denied any abuse, and no action was taken by child protective authorities. In March 2001, father engaged in an angry telephone conversation with grandfather over visitation. According to grandfather, father told him, "You people keep screwing with me and now you're going to have to watch it"; grandfather understood that remark to be a threat. Father denied making that remark but admitted that he was "a little bit out of line" in that conversation.[2] Finally—and most significantly—in a deposition taken shortly before trial, father testified that, if he were awarded custody, he would oppose any visitation between K and grandparents.

Brecy, with whom father lives, spoke angrily and disparagingly about grandparents in K's presence. As Cox, the custody evaluator, observed, "There's no doubt that [Brecy] feels an enormous amount of hostility towards

---

[2] In his trial testimony, father denied that he had any anger control problems. Rather, he explained, "This case right here has brought [out] the worst in me."

[grandparents] and does very little to disguise that." Conversely, there is no evidence that grandparents ever disparaged father in K's presence.

The increased tension, even animosity, between father, and his family, and grandparents confused and upset K. She would act out after returning from visits with father and his family. Even more disturbingly, K began biting herself, causing bruises, when she was visiting father.[3] After this case was initiated, K began engaging in obsessive hand washing, making her hands "raw." According to Cox, the custody evaluator, the biting behavior is

> "just another symptom of that kind of anxiety that this youngster experiences and has demonstrated symptoms that all the people who care about her, including the father and the mother, have expressed concern about, her sensitivity to the situation. It could be related to other things, but I'd stake 31 years [of experience] that it's—that it's related to this animosity *and the transitional DMZ that she has to go through every time she spends time with one or the other of these camps.*"

(Emphasis added.) Father, while acknowledging that behavior, largely discounted it:

> "[I]t's a sign that she's unhappy and there's a problem, you know, and basically it's the stuff right here. I don't have no doubt, *and it's usually just when she doesn't get her way. I tell her no, she can't do something, she gets really angry, and bites herself and this has been a recent thing though.*"

(Emphasis added.)

At trial, father adhered to the position, alleged in his pleadings, that grandparents were unfit to raise K. He testified as to his belief that grandparents had physically abused K; that grandparents used illegal drugs and had enlisted mother to procure drugs for them; that grandmother was engaged in a lesbian relationship; and that grandmother, through a friend who is a Wiccan, had encouraged K to engage in witchcraft. Like the trial court, we find those accusations to be unsupported by the record and indicative of father's hostility toward grandparents.

---

[3] Such behavior apparently did not occur when K was with grandparents.

Father also reiterated his position that, for years until early 2000, he did not know that grandparents were acting as K's parents. According to father, he believed (erroneously) that mother was living with grandparents and that that was why K was living with grandparents.

Father further testified that, if he were awarded custody, he would move out of Brecy's home and live separately with K. Father acknowledged that he had not lived on his own since his return to Tacoma in the mid-1990s; that he had not paid room or board since that time; and that there would be conflicts between K's schedule and his work schedule.[4] Nevertheless, father was confident that, with childcare assistance of other family members, including Brecy, he could care for K.[5]

Father testified that, if he were awarded custody, he would immediately move K from her elementary school in Salem and place her in a school in Tacoma. That was so notwithstanding that the trial occurred in May, and only a few weeks remained in the school year.[6] Father equivocated with respect to his earlier statements in his deposition that he would oppose any visitation with grandparents. Although admitting that prior testimony, he stated that, while he believed any visits should be within his sole discretion as parent, he would comply with any court order.

One final aspect of father's trial testimony is significant: Father testified that, if he were awarded custody, it was possible he would ultimately move with K to Oklahoma. Brecy owned a house in Oklahoma, and father was considering moving there to work with a relative. Father believed that his extended family in Oklahoma would support him in caring for K. Father acknowledged that such a move could be really hard for K; consequently, father would not move if it was not in K's best interests: "I mean it would have to be a really good situation for me to do that."

---

[4] At the time of trial, father worked from 6:00 p.m. until 2:30 a.m. as a building foreman for a janitorial company. It was "possible" that that shift could be changed.

[5] Brecy did not testify at trial.

[6] Indeed, because father ultimately intended to enroll K in yet another school in Tacoma, in which there were then no openings, father would have changed K's school twice within a few months.

The custody evaluator, Cox, testified at length concerning her assessment and recommendation, based on the "best interests" standards prescribed in the 1999 version of ORS 109.119.[7] Cox had conducted extensive interviews with the parties and others, and had observed them interacting with K; she understood, based on father's deposition testimony, that if father were granted custody, he would immediately remove K from grandparents' home and preclude any contact between K and grandparents.

In Cox's view, grandparents and K have a unique bond; from the time K came to live with grandparents, no one else functioned in a parental role. Because of the trauma K would experience if that bond were abruptly and completely severed—"that would be the loss of a family and it would be extremely damaging to this youngster"—Cox opposed any immediate transfer of custody. Nevertheless, Cox rendered the opinion that, ultimately, it was in K's best interest that, after an interim period, custody should be transferred to father: "I'm recommending that she stay with her grandparents and that there be a transition to the father's care over a period of several years."

In Cox's view, the "nature, scope, and timing of that transition" should be within grandparents' control and would depend on several variables, including "the depth of [father's] commitment to foster a healthy parent-child relationship" with both grandparents and mother. In that regard, Cox was concerned by father's unfounded accusations of unfitness against grandparents,[8] by Brecy's "enormous amount of hostility" towards grandparents, and by father's lack of appreciation of grandparents' contribution and the significance of their role in K's life. Cox was also concerned about father's

---

[7] As noted, the trial occurred in May 2001, before the July 31, 2001, effective date of the 2001 "*Troxel*-fix" amendments to the statute. *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000); *see O'Donnell-Lamont and Lamont*, 184 Or App 249, 258-59, 56 P3d 929 (2002), *modified on recons*, 187 Or App 14, 67 P3d 939, *rev allowed*, 335 Or 655 (2003). Nevertheless, our review is governed by the 2001 version of the statute. *Id.*

[8] Cox commented:

"It says to me that he is prepared to take a leap of assuming the worst with the smallest bit of information[,] and that is a shame because these people have been raising his daughter and loving her all these years."

"immaturity": "[T]his is a very immature young man. * * * I would like to see him grow and learn a little bit more about parenting before he assumes that role."[9] Cox further noted that animosity in both homes was damaging to K.

Cox's opinion regarding the proper duration of the transitional period varied somewhat. After stating that "a period of several years" would be appropriate, she acknowledged that even a transitional period of "a couple of months" could mitigate some of the trauma of a change in custody:

> "In transition, two months is worse—I mean not worse but it's better but it's doable in terms of—it wouldn't be my preference, I'd like a longer transition, but it would certainly be not as bad as an abrupt removal, especially at this time, you know, in her last quarter of school."

Cox explained that her recommendation of a transition "over several years" was based, in part, by her assessment of the time needed for "reattachment to form to another parent." It was her "educated guess" that such a reattachment could not occur within a period of "60 to 90 days." On cross-examination, Cox clarified that she was recommending a three-year transition period.

Ultimately, the trial court rejected Cox's recommendation for a transitional change of custody. Instead, the court awarded custody to grandparents, with both father and mother being awarded substantial parenting time. The trial court's disposition was based, primarily, on the "best interests" standard expressed in ORS 109.119 (1999), but the court went on to hold that it would reach the same result under its understanding of *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000). Central to the trial court's award of custody were the following findings:

> "2. The Grandparents have established an extremely strong emotional ties between themselves and the child. They have placed the interests of the child above their own interests during this five plus years period of time. They

---

[9] Cox also stated that mother "is neither stable enough nor mature enough to assume custodial responsibilities" but acknowledged that her evaluation was limited solely to "whether the child should be with the father or the maternal grandparents." Thus, Cox did not address the question as to who, between father and mother, would be the better sole custodial parent.

have gone out of their way to not only foster a close parenting relationship between themselves and the child but to accommodate the biological parents, Sasha Wurtele and Errin Blevins, in seeing the child.

"3. Father and Mother have both acted as if they were non-custodial parents and have had visitation or parenting time with the child during this five year period but have passively agreed to and allowed the Grandparents to act as the custodial parents for the child. Mother has had more contact and has a closer relationship with the child than Father, but Father also has a strong non-custodial parent relationship with the child. The Court specifically finds that Grandparents have established strong emotional ties creating a parent-child relationship between themselves and [K] over this five year period. These emotional ties in this relationship with the child have existed for the last five of her seven years of age.

"* * * * *

"6. Father has raised a number of issues to impute that the Grandparents are not fit to parent his daughter. Specifically the Court finds Father has over reacted in regard to the alleged sexual abuse or abuse of his daughter and the allegation is without foundation. The Court also finds no foundation for the alleged lesbian relationship between Grandmother and [a friend] and even if there is such a relationship * * *, it has not been made apparent to the child or an issue in the child's upbringing. Nor does the Court find any credence to Father's allegation that the Grandparents have any kind of substance abuse problem involving marijuana.

"7. If Father were to be awarded custody, he would immediately terminate the child's schooling and move to another area and would thereafter greatly restrict the contact between himself, the child and the Grandparents and perhaps not allow any contact at all.

"8. Father's attitude toward the Grandparents and Mother is not reasonable and not in anyone's best interest, least of all the child. Father's fears about the Grandparents are unfounded.

"9. The Court is concerned about Father's statements that his mother has made a house available to him in the State of Oklahoma and that Father would at least consider

moving with the child to Oklahoma if he were awarded custody. This would clearly destroy the relationship between the child and her grandparents.

"10. The Court is also concerned with the stress demonstrated by the child over the last several months while staying with Father, as demonstrated by her biting of herself.

"11. * * * Even if the principle in *Sleeper [and] Sleeper*, 328 Or 504[, 982 P2d 1126] (1999), has been modified by *Troxel* [ ], the Court would in fact find a compelling reason to allow Grandparents custody in this case over one of the biological parents. The compelling reason would be psychological damage done to the child if Father were to be awarded custody of his child by cutting off or drastically reducing parenting time between the child and her mother [and] her psychological parents, her grandparents, the Wurteles.

"* * * * *

"13. The animosity that has been generated between the parties in this case is extremely detrimental to [K] and the stress that she has shown as a result of that animosity is clearly not in her best interest. If that animosity continues to be demonstrated, the Court will consider either a change of custody if demonstrated by Grandparents or a reduction in parenting time if demonstrated by Father and/or his family."

On appeal, father raises a variety of challenges to the issuance of the *ex parte* temporary protective order of restraint pursuant to ORS 107.097 and the award of custody to grandparents. Grandparents and mother both appear in support of the trial court's disposition.[10] In addition, K, who did not testify at trial, appears on appeal through separate counsel.[11]

---

[10] Mother also reiterates her position in the trial court that, if grandparents do not prevail, she should be awarded sole custody of K. Given our disposition, we need not address that alternative contention and, particularly, whether a remand would be appropriate if the award of custody to grandparents were reversed. *Accord Sears*, 190 Or App at 499.

[11] K's appearance is unprecedented; no child has appeared separately in any of our reported decisions applying ORS 109.119. Here, grandparents petitioned for the appointment of separate appellate counsel for K, with grandparents and father to share the cost of representation equally. Grandparents' petition alleged, in part:

"1. After trial, the legislature revised ORS 109.119 and it applies retroactively to this case. This will be the first case (as of this date) that this Court will

Father's challenges to the *ex parte* temporary order of restraint are not justiciable in that the order, by its terms, expired upon the trial court's determination of custody, and father has not demonstrated any cognizable collateral consequence from the issuance of that order.[12] Many of father's contentions pertaining to the award of custody, and particularly his challenges to the facial constitutionality of ORS 109.119 (1999), are not preserved. In all events, as noted, *see* 192 Or App at 139 n 7, the applicable version of ORS 109.119 is the 2001 amended version of that statute—and father has not, on appeal, asserted any constitutional challenge to the latter version of the statute as written.

Nevertheless, father has properly preserved and presented for our review the fundamental question in this case: Does an award of custody to grandparents comport with the requirements of ORS 109.119?

Under ORS 109.119(1), a "grandparent * * * who has established emotional ties creating a child-parent relationship" may petition for an award of custody pursuant to ORS 109.119(3).[13] ORS 109.119(2)(a) states that "there is a

decide applying the new statute. The new statute provides a number of factors for the Court to consider in determining whether the presumption in favor of a natural parent should be rebutted. One factor is 'circumstances detrimental to the child.' An attorney for the child is best able to analyze whether such circumstances exist based on the trial record.

"2. The Court has issued nine relevant opinions since *Troxel v. Granville* and eight opinions since the trial in this case. In all opinions the natural parent prevailed over the third-party custodian or visitor. In none of the cases were the best interests of the child examined from the child's perspective. None of the children in the Court's post-*Troxel* cases to date have had the benefit of counsel for a minor child.

"3. Although it has not been dispositively determined, Grandparents submit in their brief that children in these circumstances have a 14th Amendment due process right to maintain their family-like settings and, as such, counsel appointed for the child would clarify for the Court the child's interest and how those interests are to be reconciled with the constitutional rights of the natural parent as set forth in *Troxel v. Granville*, and its Oregon progeny as well as the statutory rights of third parties as provided for in ORS 109.119."

Father opposed that petition. In February 2003, Chief Judge Deits granted the petition and appointed counsel for K.

[12] Given the lack of justiciability, we do not address grandparents' alternative contention that any challenge to the issuance of the *ex parte* order of restraint was either waived or not preserved.

[13] ORS 109.119(8)(c) defines "grandparent" as "the legal parent of the child's legal parent." ORS 109.119(8)(a) in turn defines "child-parent relationship," in part, as

presumption that the legal parent acts in the best interest of the child." ORS 109.119(3)(a) in turn, provides, in part, as follows:

> "If the court determines that a child-parent relationship exists and if the court determines that the presumption described in subsection (2)(a) of this section has been rebutted by a preponderance of the evidence, the court shall grant custody, guardianship, right of visitation or other right to the person having the child-parent relationship, if to do so is in the best interest of the child."

Finally, ORS 109.119(4)(b) provides:

> "In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award custody, guardianship or other rights over the objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:
>
> "(A)  The legal parent is unwilling or unable to care adequately for the child;
>
> "(B)  The petitioner or intervenor is or recently has been the child's primary caretaker;
>
> "(C)  Circumstances detrimental to the child exist if relief is denied;
>
> "(D)  The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or
>
> "(E)  The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."

Here, it is undisputed that father is K's "legal parent" and, thus, is entitled to avail himself of the statutory

---

"a relationship that exists or did exist, in whole or in part, within the six months preceding the filing of an action under this section, and in which relationship a person having physical custody of a child or residing in the same household as the child supplied, or otherwise made available to the child, food, clothing, shelter and incidental necessaries and provided the child with necessary care, education and discipline, and which relationship continued on a day-to-day basis, through interaction, companionship, interplay and mutuality, that fulfilled the child's psychological needs for a parent as well as the child's physical needs."

rebuttable presumption described in ORS 109.119(2)(a). We also determine, without further discussion, that grandparents have established a "child-parent relationship" with K, within the meaning of ORS 109.119(1) and (8)(a). Consequently, the determination of grandparents' petition under ORS 109.119(1) depends on the resolution of three questions. *First*, by reference to ORS 109.119(4)(b), have grandparents rebutted the statutory presumption that father acts in K's best interest? *Second*, if so, would an award of custody to grandparents be in K's best interests? *Third*, even if grandparents prevail on the first two questions, would an award of custody pursuant to the statute comport with constitutional requirements? *Winczewski*, 188 Or App at 675 (Deits, C. J., concurring).

The precise content of the third, constitutionality, inquiry is still evolving. In *Winczewski*, four members of this court (Judges Haselton, Linder, Kistler, and Wollheim) joined in Chief Judge Deits's en banc concurring opinion, endorsing the following propositions:

"An application of ORS 109.119 that results in an award of custody to a nonparent unconstitutionally infringes on a parent's fundamental right to the care, custody, and control of his or her children unless the nonparent has demonstrated by a preponderance of the evidence that there are compelling reasons that the parent should not receive custody.

"* * * * *

"* * * In other words, the application of ORS 109.119 resulting in an award of custody to a nonparent is an unconstitutional infringement on a parent's fundamental right to the care, custody, and control of his or her child unless the nonparent has demonstrated by a preponderance of the evidence that, in light of the child's particular needs, the parent cannot or will not provide adequate love and care for his or her child or that placement of the child in the parent's custody would cause the child an undue risk of physical or psychological harm."

188 Or App at 702, 706 (footnote omitted). In addition, four other members of the court (Judges Landau, Brewer, Armstrong, and Schuman), while generally agreeing with that formulation, *see id.* at 758 (Brewer, J., dissenting);

*id.* at 760 (Schuman, J., dissenting), suggested that, in appropriate cases, the constitutional inquiry should also encompass consideration of the child's interests in maintaining a relationship with a person who has acted in a parental role. *Id.* at 749-57 (Brewer, J., dissenting); *id.* at 761 (Schuman, J., dissenting).[14]

■      We defer, for now, any further exploration (much less explication) of constitutional standards, and return to the statutory rebuttal criteria. ORS 109.119(4)(b). We conclude, based on the combination of several factors, that grandparents rebutted the presumption that father acts in K's best interest. In particular, although father is willing and able to adequately care for K, ORS 109.119(4)(b)(A), the other rebuttal criteria decisively favor grandparents.

Grandparents are K's "primary caretaker[s]." ORS 109.119(4)(b)(B). But even more, they have acted in that role for five years, from when she was two-and-one-half years old until trial, when she was seven-and-one-half years old. No other relationship in K's life qualitatively approaches the "primary bond" she has with grandparents.

Notwithstanding his latter-day protestations, father historically fully consented to grandparents' parental relationship with K. ORS 109.119(4)(b)(D). Father's assertions that he believed, until early 2000, that mother was acting as K's primary caretaker are, in the totality of the circumstances, not credible. Instead, the record demonstrates that father was content to have grandparents assume the material and emotional responsibilities of rearing a young child

---

[14] Judge Schuman described the difference between his dissent (in which Judge Armstrong joined) and Judge Brewer's dissent (in which Judge Landau joined):

"I also agree with Judge Brewer that the resolution of cases involving disputes between parents and third parties requires a more sensitive evaluation of the child's interest than *Troxel* appears to acknowledge. I do not join Judge Brewer's dissent only because I see no need to label the child's interest as a free-standing fundamental substantive due process right instead of an interest protected by the state as *parens patriae*."

188 Or App at 761. Judge Edmonds filed a separate dissent that posited that "there must be a compelling state interest present before the state can constitutionally exercise its authority." *Id.* at 732 (Edmonds, J., dissenting); *see also id.* at 737 ("[M]other's fundamental right to parent is entitled to heightened protection and cannot be infringed absent a compelling state interest.)."

while he availed himself of visitation. We do not question that father's relationship with K was, and is, warm and affectionate. But neither do we question that, while father took K to the park and on holiday outings, he never visited her school, talked with her teachers, checked with her doctors, or assumed any traditional parental role in her life.

Nevertheless, father has made it clear that, given the opportunity, he will at least severely restrict, and probably completely preclude, contact between K and grandparents. ORS 109.119(4)(b)(E). Like the trial court, we discount father's equivocation at trial and view father's unabashed deposition testimony as far more credible in that regard. And, like the trial court, we find it alarming that father would seriously entertain the prospect of a move to Oklahoma following the transfer of custody, removing K from all that is stable and familiar in her young life.

Finally, and most significantly, father's determination to preclude contact with grandparents would, if realized, be detrimental to K. ORS 109.119(4)(b)(C). For whatever reasons, father has refused to acknowledge the strength of K's bond with grandparents and the trauma she will suffer if that bond is severed. Father has ignored or discounted K's unmistakable manifestations of anxiety, while persisting in his irresponsible accusations against grandparents and acquiescing in Brecy's angry denigration of grandparents in K's presence. Despite Cox's unequivocal recommendation of even a minimal transitional period to mitigate emotional injury to K, father continued to insist on an immediate transfer of physical custody. It is revealing that, despite the fact that only a few weeks remained in the school year, father was fully prepared to remove K and enroll her temporarily in a new school in Tacoma. Those circumstances, in combination, sufficiently rebut the presumption that father acts in K's best interest. *Accord Sears*, 190 Or App at 497-98 (holding that the petitioner grandparents had failed to rebut statutory presumption where, *inter alia*, there was no testimony by expert custody evaluator, there was no persuasive proof of potential detriment to child, and there was no suggestion that the legal parent would impede or preclude meaningful contact with the grandparents).

■ Conversely, although the overlap is not exact, many of the same considerations counsel that awarding custody to grandparents would be in K's best interest. ORS 109.119(3)(a). The record demonstrates that, while grandparents, and particularly grandmother, are well attuned to K's emotional needs, father is largely insensitive or oblivious to those needs. While grandparents have, for the most part, attempted to avoid anxiety-generating conflict, father has instigated and perpetuated such conflict.[15] For the same reasons, we believe that, unlike father, who would preclude contact with grandparents and burden contact with mother,[16] grandparents will continue to foster full and free contact between K and both father and mother. Given those considerations—the duration and depth of K's child-parent relationship with grandparents, the parties' relative appreciation of, and responsiveness to, K's needs, and their diametrically different attitudes with respect to cooperating and promoting contact—we agree with the trial court that allowing grandparents' petition comports with K's best interest.

We turn then to the final, constitutional inquiry: Have grandparents established by a preponderance of the evidence that there are "compelling reasons" that father should not have custody? *Winczewski*, 188 Or App at 702 (Deits, C. J., concurring). Specifically, have grandparents shown that, given K's particular needs, father either "will not provide adequate love and care" for her or that placement of K in father's custody would cause her "an undue risk of physical or psychological harm"? *Id.* at 706 (Deits, C. J., concurring).

Several factors inform and guide our consideration. *First*, as nine members of the court agreed in *Winczewski*, the statutory and constitutional inquiries are distinct.[17] That is,

---

[15] In that regard, we note that, despite father's express determination to move into his own home, it is probable, given his circumstances, that he will continue to live with Brecy, whose hostility towards grandparents is patent.

[16] Father alleged that any visitation with mother should be supervised because mother "has an ongoing drug and alcohol problem that has been the basis of her abandonment of her child." There is no evidence in this record substantiating that allegation.

[17] Necessarily implicit in Judge Edmonds's analysis is the premise that ORS 109.119, through its structure and content, embodies the minimum requirements of due process. *Winczewski*, 188 Or App at 717 (Edmonds, J., dissenting).

even if petitioners can satisfy the requisites of ORS 109.119(3)(a), that showing may still fall short of the constitutional threshold. There is, at least potentially, a "Twilight Zone" between the two that, to date, has remained unexplored. *Compare Winczewski* (award of custody to the petitioner grandparents comported with both statutory and constitutional requirements) *with Sears* (the petitioner grandparents' evidence failed to rebut statutory "best interest" presumption, obviating any need to consider the constitutionality of the custody award).

*Second,* while analytically distinct, there can be considerable practical overlap between and among various facets of the statutory analysis and the constitutional analysis. For example, evidence that is probative of the "[c]ircumstances detrimental to the child" rebuttal factor, ORS 109.119(4)(b)(C), can also be relevant to the statutory "best interest" requirement, ORS 109.119(3)(a)—that is, the avoidance of detriment may well be in the child's best interest—and the same evidence, if sufficiently compelling, can establish that placement in the legal parent's custody would expose the child to "an undue risk of physical or psychological harm." *See, e.g., Winczewski,* 188 Or App at 698-700, 706-07 (Deits, C. J., concurring).

*Third,* the constitutionally required showing need not rise to the level of that required for termination of parental rights; that is, petitioners need not show that the legal parent is "unfit." *Winczewski,* 188 Or App at 702-06 (Deits, C. J., concurring); *id.* at 758 (Brewer, J., dissenting); *id.* at 760 (Schuman, J., dissenting). Nevertheless, by reference to our decisions applying prior versions of ORS 109.119, the risk of harm to the child must be particularized and severe. Hypothetical or general concerns without reference to the child's individual circumstances are not enough. *See, e.g., State v. Wooden,* 184 Or App 537, 553-54, 57 P3d 583 (2002); *O'Donnell-Lamont and Lamont,* 184 Or App 249, 258-59, 56 P3d 929 (2002), *modified on recons,* 187 Or App 14, 67 P3d 939, *rev allowed,* 335 Or 655 (2003).

*Fourth,* even severe harm, if only temporary, may not be sufficiently constitutionally "compelling" to support an award of custody to a nonparent. *See, e.g., Wooden,* 184 Or App at 537 (where child's therapist stated that an immediate

("right now") change of custody from the maternal grandparents to the father would be "devastating and traumatic" to the child, but rendered no opinion as to long-term consequences, much less any recommendation concerning custody, and court-appointed evaluator testified that the child would not be harmed by a gradual transition to the father's custody, court erred in awarding custody to the grandparents). However, where appropriate, the court may mitigate the trauma from an abrupt change of custody by ordering a transitional period, temporarily deferring placement with the legal parent. *Id.* at 554 (directing that the father was entitled to custody "following a six-month transition period during which the visitation schedule ordered by the trial court will remain in effect").

■      Here, there is no suggestion that father cannot or will not provide K with adequate care or that K is at risk of physical harm from father. Thus, as in *Wooden*, the constitutional "compelling reasons" inquiry focuses on the risk of psychological harm to K. Our assessment of that potential harm derives ultimately from a combination of Cox's evaluation, K's particular circumstances, and father's likely conduct if he were awarded custody.

As noted, Cox recommended that the court award custody to father, subject to a three-year transitional period. 192 Or App at 139-40. Two concerns about emotional injury—one explicit, and the other implicit—underlay that recommendation. Explicitly, Cox was concerned that K would suffer severe trauma—"it would be extremely damaging to this child"—if her relationship with grandparents, her "primary bond," was abruptly altered. Implicitly, Cox was also concerned that K would suffer lasting emotional injury unless she had a substantial continuing relationship with grandparents even after a change in custody. That implicit concern necessarily underlay Cox's recommendation that *grandparents* control the "scope and timing" of any transition subject to a variety of considerations, including father's commitment to foster ongoing relationships with grandparents, as well as mother. Indeed, Cox's recommendation assumed that grandparents would have substantial visitation with K after any transfer of custody.

Father's attitude and conduct belie that assumption. Like the trial court, we believe that, if given the opportunity, father will preclude any meaningful contact between K and grandparents—and he will do so notwithstanding the resultant psychological harm to K from the loss of the primary relationship in her life. Father's animosity towards grandparents, as evinced by his continuing, baseless accusations, is patent. Father has persisted in his hostility despite K's emotional confusion and anxiety, as manifested in obsessive and self-destructive behaviors, which father largely discounts. And father has made it clear that he is prepared to exercise his parental prerogatives—if necessary, by an abrupt transfer of custody and change of residences and schools—regardless of K's needs.

To some extent, a transitional period, as recommended by Cox, can mitigate the trauma that would result from an abrupt change of custody. *See Wooden,* 184 Or App at 553. But a transitional period cannot prevent the lasting psychological injury that K will suffer when, upon an eventual transfer of custody, father cuts off all contact with grandparents and raises K in a home in which grandparents are vilified or, at least, their role in K's life is denigrated.

In that fundamental respect, this case differs from *Wooden.* In *Wooden,* there was no suggestion of animosity between the father, or his family, and the maternal grandparents. Rather, while disputing permanent custody, the parties there had cooperated and shown "admirable devotion to the welfare of [the] child." *Id.*[18] In *Wooden,* there was no evidence that the father discounted the importance of the child's relationship with the grandparents. Finally, and most significantly, in *Wooden,* there was no evidence that the father intended to preclude future contact with the grandparents, completely severing the "primary bond"—indeed,

---

[18] For example, in *Wooden,* the father had initially sought an immediate transfer of custody. However, after receiving the report of the court-appointed psychologist, he agreed to a one-year interim extension of the grandparents' physical custody, with substantial visitation to promote the development of a healthy parent-child relationship between the child and himself. 184 Or App at 541-42. Here, in stark contrast, father opposed any transitional period, notwithstanding Cox's opinion that an abrupt transfer of custody would be "extremely damaging" to the child, and expressed his determination to remove K from school immediately, despite the fact that only six weeks remained in the school year.

the only parental bond—in virtually all of the child's conscious life.[19]

In sum, here, unlike in *Wooden*, a transitional period cannot adequately address the parties' circumstances and the consequent threat of psychological injury to K. Rather, given father's express determination to preclude any meaningful contact between K and grandparents, placement of K in father's custody, even after a transitional period, would expose her to undue psychological harm. We thus conclude that constitutionally sufficient "compelling circumstances" exist.[20] *Cf. Fenimore v. Smith*, 145 Or App 501, 509-11, 930 P2d 892 (1996), *rev den*, 326 Or 389 (1998) (applying "compelling reason" standard of *Hruby and Hruby*, 304 Or 500, 510-11, 748 P2d 57 (1987), and holding that stepfather of adolescent daughter who had suffered "traumatic loss" from her mother's death overcame presumption in favor of biological father, because removing the child from stepfather's home would have caused her "undue psychological harm" despite the biological father's fitness). Accordingly, we affirm the award of custody to grandparents.

Affirmed.

---

[19] We note that, in *Wooden*, while the grandparents had had a significant role in the child's life, the child's mother was his primary caregiver until she was murdered in January 1999, when the child was nearly six years old. The grandparents then received temporary custody of the child and acted as primary caregivers, subject to substantial parenting time with the father, until the trial in June 2000, when the child was nearly seven-and-one-half years old. Thus, while the grandparents in *Wooden* acted as primary caregivers for 18 months, beginning when the child was nearly six, grandparents here had acted in that role for five years, beginning when K was two-and-one-half year's old. 184 Or App at 540-41.

[20] As noted, K separately appeared in this appeal through appointed counsel. 192 Or App at 142 n 11. In her appellate submissions, K urged affirmance of the trial court's award of custody to grandparents. Given our constitutional analysis and disposition based solely on the existence of "compelling circumstances," we need not, and do not, address the significance, if any, of K's expressed preference in determining the constitutionality of an award of custody to a nonparent pursuant to ORS 109.119. *Accord Winczewski*, 188 Or App at 749-57 (Brewer, J., dissenting); *id.* at 761 (Schuman, J., dissenting).