Argued and submitted November 27, in A129927, reversed; in A129926, reversed and remanded with instructions to award custody to father December 26, 2007, petition for review denied May 29, 2008 (344 Or 558)

Meggan Claire MUHLHEIM,
*Petitioner-Respondent,*

*v.*

Bradley J. ARMSTRONG,
*Respondent-Appellant.*
040204, A129926 (Control);

Todd P. MUHLHEIM
and Robin Muhlheim,
*Petitioners-Respondents,*

*v.*

Bradley J. ARMSTRONG,
*Respondent-Appellant,*

*and*

Meggan Claire MUHLHEIM,
*Respondent.*

Linn County Circuit Court
051267; A129927

175 P3d 521

James D. Huffman argued the cause for appellant. With him on the briefs was Huffman & O'Hanlon.

Russell Lipetzky argued the cause and filed the brief for respondents Todd P. Muhlheim and Robin Muhlheim.

No appearance for respondent Meggan Claire Muhlheim.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

## HASELTON, P. J.

In these consolidated cases, father challenges the award of custody of his daughter, E, to her maternal aunt and uncle pursuant to the psychological parent statute, ORS 109.119.[1] Father contends that the trial court erred in determining that aunt and uncle had established a "[c]hild-parent" relationship with E, ORS 109.119(10)(a), and that aunt and uncle had rebutted the statutory presumption of ORS 109.119(2)(a) that "the legal parent acts in the best interest of the child." Father further contends that the trial court erred in admitting certain evidence and in considering issues not framed by the pleadings. Because we agree with father that aunt and uncle did not rebut the statutory presumption that father acts in the child's best interests, we reverse without reaching father's remaining assignments of error.

We review the facts *de novo*. *Wurtele v. Blevins*, 192 Or App 131, 84 P3d 225, *rev den*, 337 Or 555 (2004). Most of the facts are not disputed, although the inferences to be drawn from them are strongly disputed. E was born in January 2001. Father and mother were not married or living together when E was born, but they voluntarily acknowledged father's paternity.

Mother lived at various times in Portland and Albany. Mother's life apparently was quite chaotic, and she had numerous mental health problems. On occasion, she and E would stay with E's maternal grandparents in Albany during crises. E also saw aunt and uncle, who live in Portland, on holidays and for visits and she stayed with them on occasion when mother was having problems. Father had visits with E both in Albany and in Portland. Mother would bring E to visit father, who lives in St. Helens, on some holidays as well. However, most of father's efforts to share time with the child were unsuccessful because of mother's unreliable and unpredictable behavior.

---

[1] The "psychological parent" proceeding brought by aunt and uncle is A129927. As we explain below, the other case consolidated for our consideration, A129926, involved a custody proceeding brought by mother. Judgments awarding custody of E to aunt and uncle were entered in both cases, and father appeals both judgments.

Mother initiated a custody proceeding in January 2004. In that proceeding, both parents sought custody of E. A temporary order was entered on January 30, 2004, which prohibited both mother and father from hiding or secreting E from the other party or changing E's usual place of residence, which was mother's address in Albany. The temporary order also provided for father to have supervised parenting time up to twice a month. However, despite the temporary order, mother's willingness to follow through with plans for E to spend time with father lessened after the custody case was filed. Attempts to mediate a parenting time plan were not successful. Mother would not allow father to see E at Christmas in 2004.

In January 2005, mother's situation apparently took a turn for the worse.[2] Father was no longer able to contact her by telephone. Aunt—mother's sister-in-law—testified that mother was experiencing mental health problems, was taking drugs, and was involved in an abusive relationship. In late January 2005, the Department of Human Services (DHS) became concerned about E's welfare after receiving reports about drugs and domestic violence in mother's home. In light of those concerns, a DHS worker, Davis, consulted E's maternal grandparents about possible family resources for E. Grandparents identified aunt and uncle as potential resources. Mother agreed with Davis that E could live with aunt and uncle.

Davis did not contact father or consider him to be a placement resource because mother indicated that father had no relationship with E and had engaged in domestic violence. Davis knew that a custody case was pending between father and mother concerning E, but he was unaware of the order that prohibited moving E from her current address or secreting E from father. Davis placed E with aunt and uncle on January 26, 2005, and instructed them not to contact father.

---

[2] Because mother failed to appear for trial in the custody case, her pleadings were struck. The record contains almost no direct evidence about E's circumstances when she was in mother's care.

Father became concerned when he was unable to reach mother, and he left a telephone message for the maternal grandparents, trying to locate E. Father also tried contacting mother's attorney in the custody proceeding but had no success in locating mother. Finally, in early April, father was able to reach mother's boyfriend by telephone and learned that E was with aunt and uncle. Father telephoned uncle and left a message that he wanted to see E. Uncle returned the call several days later and agreed to set up a visit. Shortly thereafter, aunt and uncle filed their petition for guardianship of E.

The custody case was scheduled for trial on May 2, 2005. Mother's lawyer appeared and sought a continuance on the ground that mother was currently hospitalized. Aunt and uncle's lawyer appeared and requested that the guardianship petition be consolidated with the custody proceeding. The court allowed both the continuance and the consolidation. The court scheduled a status check and parenting time hearing for June 15. After the May 2 continuance, aunt and uncle initiated their action pursuant to ORS 109.119 seeking custody of E.

Meanwhile another DHS caseworker, Purcell, had become involved in the case. Approximately a week after father contacted uncle, Purcell contacted father. He told father that E's maternal grandparents had not wanted father to be contacted because they were afraid that he would take custody of E. Father was upset that he had not been contacted earlier and indicated that he wanted to talk with his attorney. Father also contacted the sheriff's office to inquire about getting E removed from aunt and uncle's care, and the sheriff's office called Purcell at DHS. Purcell later told father that he should have contacted DHS rather than the sheriff's office.

Purcell thereafter arranged a "family decision meeting" on May 12 with father, aunt and uncle, maternal grandparents, and paternal grandmother. At that meeting, father inquired why DHS had removed the child from mother's care, and Purcell responded that the reasons were confidential. Father made it clear that he wanted custody of E. At that meeting, father was upset because he discovered that E was

referring to her aunt and uncle as "mom and dad" and because aunt claimed that she was the child's mother. The parties, however, managed to reach an agreement that father would be allowed to schedule visits with E. Thereafter, father had a number of successful visits and outings with E at which she appeared to enjoy herself and enjoy father's company.

On June 15, the court held the previously scheduled status check and parenting time hearing. Mother did not appear at that hearing, and the court was informed that her attorney had withdrawn from the case. The court directed that aunt and uncle's new petition under the psychological parent statute be consolidated with the other pending matters, and the case was scheduled for trial the following week. The parties reached an informal agreement that parenting time would continue as it had in the previous months.

The case went to trial on June 21, 2005, approximately five months after E began living with aunt and uncle. Aunt and uncle presented evidence about the circumstances that brought E into their care in January, as recounted above. They also presented evidence about the stability of their home and family, as well as persuasive evidence that E was, in fact, bonded with them, doing well in preschool, involved in a multitude of wholesome activities, and thriving in their care.

Aunt and uncle presented testimony from Dr. Norvin Cooley, a psychologist who evaluated the relationship between E and aunt and uncle in order to provide testimony about the existence of a "child-parent relationship" between them. Cooley did not perform a custody evaluation. He met with E for an hour and with aunt, uncle, and maternal grandparents for two additional hours. Cooley concluded that E was healthy and bonded to aunt and uncle, and that her psychological needs were being met by them. He rendered the opinion that, given that E's life had already been disrupted in the care of her mother, she needed stability, which could be provided in the aunt and uncle's home. Although Cooley had no information about father and had not met him, he further stated that, although E had an attachment with her father, she did not know him well and was not comfortable with him and should be exposed to him only in a safe environment such

as aunt and uncle's home. Cooley predicted that removing E from her aunt and uncle's home would cause significant interruption in her development and possibly result in development of an attachment disorder.

Aunt testified that E became anxious before and after seeing father and that, on one occasion, when they were about to meet father at a restaurant, E told aunt that she wanted to go home. Aunt testified that she was concerned about father having custody of E because she had been told that he had "criminal issues related around alcohol and driving" and had not furnished her with any evidence that he had completed a drug and alcohol treatment program.

Uncle testified that he was aware that there was a custody case pending between father and mother when E moved in with them in January, but he did not understand that father wanted custody of E. He acknowledged that father was not informed of E's location between January and April 2005; nevertheless, uncle faulted father for not trying harder to see E during that time period. Uncle testified that he did not think that father could meet E's needs because of father's "past record," his lack of parenting experience, and his lack of knowledge of her.

Father then testified. He recounted that he had made an effort to have regular visits with E while she lived with mother and described the difficulties and resistence he had encountered. He testified about his unsuccessful efforts to locate E between January and April 2005 and about his frustration with the situation and his inability to discover what had happened. Father presented credible evidence that, although there had been some difficulties arranging his visits with E after he located her in April 2005, their visits since had been pleasant and generally successful. He testified that E calls him "daddy." Father also expressed the belief that E was bonding with his mother during their visits.

Father described his general circumstances. He is part of a large family and has lived in St. Helens most of his life. He currently resides with his mother and brother. Father has training to be an apprentice lineman and is a journeyman equipment operator, currently working as an equipment operator in the industrial maintenance field. He

works full time, earns $12 per hour, and has health insurance through his employer. Father's family's home is in the country, has four bedrooms, and has a large yard. Father further testified that he had cared for the children of two different girlfriends at several points in his life, and had experience in diapering children, cooking for and feeding children, doing laundry, and repairing toys. He stated that he had never neglected or abused a child.

Father also presented evidence that he had pleaded guilty to charges of felony eluding a police officer and misdemeanor battery in 1996, for which he served a probationary sentence in Idaho. After his return to Oregon, in 1999 father pleaded guilty to possession of less than an ounce of marijuana—a violation—and paid a fine. Also in 1999, father pleaded guilty to attempting to elude a police officer and received a probationary sentence. In 2004, father pleaded no contest to a charge of driving under the influence of intoxicants and attempting to elude police and was, again, placed on probation. He served 30 days in jail as a condition of probation and also had his driving privileges suspended. Father testified that he is currently complying with the conditions of his probation, that he abstains from consumption of alcohol, and that there is no alcohol in his home.

Finally, father testified that he believed it was important for E to have continuing contact and a relationship with aunt and uncle—and that he would foster such a relationship. Father stated that he believed that E's transition into his home should be a slow process and that a specialist should be consulted in how to arrange the transition.

Father's mother also testified at trial. She indicated that she was retired from a position with the St. Helens Police Department, that she had lived in their current home for 28 years, and that there was a preschool located approximately a mile from their house that E could attend. She believed that father has a good relationship with E, that E understands that he is her father, and that she has emotional ties to him. She further expressed her belief that father is fit to be E's custodial parent. Father's mother also indicated that she understood that E had bonded with aunt and uncle, that she had meaningful relationships with cousins on that

side of the family, and that a custodial transition should proceed with care.

The trial court subsequently issued an opinion letter and judgments in both cases granting custody to aunt and uncle pursuant to ORS 109.119. The trial court determined that E has a "[c]hild-parent relationship" with aunt and uncle. ORS 109.119(10)(a). The court further determined that the ORS 109.119(2)(a) presumption had been rebutted. In so concluding, the court determined that father does not have a meaningful and beneficial relationship with E and had not taken adequate steps to develop such a relationship; that father's "substance abuse, criminal conduct, and anger or behavior control problems provide circumstances detrimental to the child"; that father was unwilling or unable to adequately care for E; that father had "fostered, encouraged or consented to the relationship between" E and aunt and uncle; and that, given E's emotional attachment to aunt and uncle and her need for stability, circumstances detrimental to E would exist if relief were denied.

■    On appeal, father raises a variety of contentions. Among other arguments, he challenges the trial court's determinations that a "child-parent" relationship exists between E and aunt and uncle and that aunt and uncle had sustained their burden in rebutting the "presumption that the legal parent acts in the best interest of the child," ORS 109.119(2)(a). We conclude, on *de novo* review, that aunt and uncle failed to rebut the statutory presumption that father "acts in the best interest of the child." ORS 109.119(2)(a). Accordingly, and without addressing father's other contentions, we reverse.

ORS 109.119 permits a nonparent "who has established emotional ties creating a child-parent relationship" to petition a court for custody, guardianship, or visitation rights with a child. ORS 109.119(1), (3). In order for such relief to be granted, however, the petitioner must overcome "a presumption that the legal parent acts in the best interest of the child." ORS 109.119(2)(a). ORS 109.119(4)(b) provides:

"In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award custody, guardianship or other rights over the

objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A) The legal parent is unwilling or unable to care adequately for the child;

"(B) The petitioner or intervenor is or recently has been the child's primary caretaker;

"(C) Circumstances detrimental to the child exist if relief is denied;

"(D) The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

"(E) The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."

The court must find "by a preponderance of the evidence," ORS 109.119(3)(a), that the presumption has been rebutted in order to grant custody to a nonparent over the legal parent's objection.

■ On *de novo* review, we give " 'considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony.' " *O'Donnell-Lamont and Lamont*, 337 Or 86, 89, 91 P3d 721 (2004), *cert den*, 543 US 1050 (2005) (quoting *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990)). However, despite our deference to the trial court's ability to assess the demeanor and credibility of the witnesses, we must conclude on this record that the trial court's determination that the statutory presumption of ORS 109.119(2)(a) had been rebutted is not supported by a preponderance of the evidence.

As the Supreme Court explained in *O'Donnell-Lamont*, the rebuttable presumption of ORS 109.119[3] was intended to codify the holding in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), that "some special weight" must be given to a fit parent's determination of what

---

[3] The court was interpreting the 2001 version of the statute. However, the provisions pertinent to our analysis have not changed significantly since then.

is in a child's best interests. *O'Donnell-Lamont*, 337 Or at 100-01, 106. The court rejected the idea that the presumption established by ORS 109.119(2)(a) could be rebutted only by a showing that the parent would harm the child or was unable to care for the child. *Id.* at 107. Rather, the court explained, "the weight to be given to each of the five statutory factors, to the evidence supporting those factors, and to other relevant evidence, will vary." *Id.* at 108.

We consider, in turn, each of the rebuttal factors specified in ORS 109.119(4)(b). The first factor concerns whether "[t]he legal parent is unwilling or unable to care adequately for the child." ORS 109.119(4)(b)(A). In *O'Donnell-Lamont*, the court emphasized that

> "consideration of this factor does not allow the court to substitute its judgment for that of a parent by determining that the nonparent is *better* able to care for the child. The legislature's use of the word 'adequate' suggests that the parent must have the willingness and ability to provide something more than a bare subsistence level of care for the child, but that it would be inappropriate to compare a parent's 'adequate' care with a nonparent's 'more than adequate' care in considering this factor."

337 Or at 110 (emphasis in original).

Applying the first rebuttal factor, the Supreme Court in *O'Donnell-Lamont* concluded that the father's job as a truck driver, his residential instability, and his personal shortcomings as a parent did not demonstrate that he was unwilling or unable to care for the children. *Id.* at 111. *Accord Strome and Strome*, 201 Or App 625, 629-30, 633, 120 P3d 499, *rev den*, 339 Or 701 (2005) (concluding that the father's "past inadequacies as a parent"—which included only limited involvement with the children, yelling at them and calling them obscene names, taking drugs, and working as an escort for wealthy older men—did not establish that, as of the time of trial, he was unwilling or unable to care adequately for the children).

Here, the evidence of father's unwillingness or inability to care adequately for E is far weaker than in either *O'Donnell-Lamont* or *Strome*. Father testified that he was willing and able to care for E, and he presented evidence that

he lives in a stable home, is gainfully employed, and has experience caring for children. He further testified that, following his relatively recent DUII conviction, he was complying with all terms of probation, including abstaining from consumption of alcohol. Nothing in the record contradicts father's testimony in those respects.

In response, aunt and uncle emphasize that father has never been E's primary caretaker, and they contend that he was indifferent in maintaining contact with E during the period that she lived with mother. Neither of those contentions is persuasive. Frequently—perhaps usually—in *Troxel* situations, the legal parent contesting the petition has never been the child's primary caretaker. That, without more, hardly demonstrates an inability or unwillingness to care adequately for the child. Further, and contrary to aunt and uncle's assertions, we believe that, in the totality of the circumstances, including mother's instability, father did undertake good faith efforts to maintain contact with E.

Further, to the extent that the trial court's findings relating to "substance abuse, criminal conduct, and anger or behavioral control" may be relevant to the first rebuttal factor, we find little credible evidence to support those findings. As to substance abuse, the only evidence in the record is that father once possessed less than an ounce of marijuana before E was even born, and once drove while under the influence of intoxicants in November 2004. Although those circumstances may well indicate that father had, or may even continue to have, issues involving substance abuse, they come nowhere near establishing that he has substance abuse problems that rise to the level of making him currently unable to adequately care for a child. Although father's criminal history is hardly laudatory, it is not so extensive or egregious to suggest that he is currently unable to be an adequate parent.

Finally, with respect to the first rebuttal factor, the record is devoid of evidence to suggest that father has a serious problem with "anger or behavioral control." Although mother apparently stated at one point that father had engaged in domestic violence, no evidence about that alleged occurrence was adduced at trial. The record does establish that father was angry and upset about the fact that he was

unable to locate his daughter for approximately three months. However, giving due consideration to the totality of the precipitating circumstances, we regard father's reaction to the inability to locate and maintain contact with E as an expression of situational frustration and not as an indication of some potentially disqualifying inability to control his anger.

We turn to the second rebuttal factor: "The petitioner or intervenor is or recently has been the child's primary caretaker[.]" ORS 109.119(4)(b)(B). That factor clearly has been established on this record; the aunt and uncle were E's primary caretakers for the five months preceding the trial.

The third rebuttal factor concerns whether "[c]ircumstances detrimental to the child exist if relief is denied." ORS 109.119(4)(b)(C). In *O'Donnell-Lamont*, the court concluded that that factor concerns "whether *present* circumstances cause *present* detriment to the child." 337 Or at 112 (emphases in original). The court explained that the presumption of ORS 109.119(2)(b) "would be almost meaningless" if it could be overcome simply by evidence that living with the legal parent "may cause" some type of psychological, emotional, or physical harm in the future. *Id.* Thus, "the nonparent must demonstrate that the circumstances of living with the legal parent pose a *serious present risk* of psychological, emotional, or physical harm to the child." *Id.* at 113 (emphasis added).

For the reasons explained above, we reject the trial court's conclusion that evidence of father's "substance abuse, criminal conduct, and anger or behavioral control problems" established the third rebuttal factor in this case. *See also Strome*, 201 Or App at 634-35 ("In the absence of evidence that father's drug use has continued into the present * * * we cannot conclude that father's past substance abuse poses a serious present risk of psychological, emotional, or physical harm."); *Sears v. Sears*, 198 Or App 377, 108 P3d 639, *rev den*, 339 Or 156 (2005) (evidence of mother's past marijuana and alcohol use did not demonstrate a serious present risk to child).

We agree with the trial court that E's emotional attachment to aunt and uncle, the nature of her relationship with father, and her need for stability are highly relevant to this factor. However, the trial court's finding that father has no "meaningful and beneficial relationship" with E is not supported by the record. Rather, the record establishes that, although father's contact with E has been limited throughout her life and he has never lived with her or been her primary caretaker, she knows him, understands that he is her father, and enjoys being with him.

With respect to E's need for stability, aunt and uncle emphasize Cooley's testimony. As noted, Cooley testified about E's attachment to aunt and uncle and her general well-being in their care, and he further testified that removing her from her aunt and uncle's care would cause significant disruption to her development.

Cooley's testimony is, however, of limited use. As the court explained in *O'Donnell-Lamont*, the third rebuttal factor addresses whether "the circumstances of *living with the legal parent* pose a serious present risk of psychological, emotional, or physical harm to the child." 337 Or at 113 (emphasis added). Here, Cooley did not meet father or know anything about father's circumstances—much less observe father and E together. Accordingly, his general conclusion that any move of E from aunt and uncle's house would be detrimental to her is simply an iteration of the obvious point that changing the custody of a four-year-old child when she is happy where she is will at least temporarily disrupt the child's life. Evidence that E is thriving in aunt and uncle's care simply is not enough. *Cf. Sears*, 198 Or App at 382 ("the benefit of continuity of caregiving and the significance of the relationship between" child and nonparents was important to this factor, but not dispositive).

With respect to the fourth factor, the trial court found that father "has fostered, encouraged or consented to the relationship between the child and" aunt and uncle. ORS 109.119(4)(b)(D). We disagree—at least to the extent that the trial court determined that father had fostered, encouraged, or consented to aunt and uncle developing a *child-parent* relationship with child. Although the record substantiates

that father consented to aunt and uncle maintaining a *family* relationship with child—and, in fact, he testified that he would promote the continuation of such a family relationship if child were in his custody—there is no evidence that father ever fostered, encouraged, or consented to the placement of E into aunt and uncle's home. To the contrary, father did not know that E was there until shortly before aunt and uncle initiated these proceedings—and, when he did learn of that circumstance, he objected strongly.

The final rebuttal factor is whether "[t]he legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor." ORS 109.119(4)(b)(E). There is no evidence of actual preclusion of contact; father has never been in a position to limit or restrict contact between E and aunt and uncle, unreasonably or otherwise. However, we have indicated that that factor may also properly pertain to whether a parent will, in the future, unreasonably restrict or preclude contact between a child and a petitioner-intervenor. *See Wurtele*, 192 Or App at 147. We are persuaded that, in this case, there is no substantial prospect of such future preclusion of contact.

Both father and father's mother agreed that E should have a continuing relationship with aunt and uncle and their extended family. Significantly, they further agreed that a change from aunt and uncle's custody should occur gradually, as facilitated by a professional. Although this custody battle has clearly caused animosity among these parties, we have confidence that all parties have the ability to put E's needs first and to develop a workable arrangement that will not deprive E of any important relationship. *Accord Wurtele*, 192 Or App at 137, 147 (affirming award of custody to the petitioner grandparents where, *inter alia*, father accused petitioners of witchcraft, child abuse, and using child to procure drugs, refused to acknowledge that child had a bond with petitioners, and had "made it clear that, given the opportunity," he would probably preclude contact).

Having considered the evidence of all five factors listed in ORS 109.119(4)(b), the final inquiry is whether, under the totality of the circumstances, aunt and uncle have rebutted the statutory presumption of ORS 109.119(2)(a). In

doing so, we consider the evidence relevant to those factors, but are not limited to those considerations. In this case, we deem it necessary to make an observation that is not conclusive as to any of the five factors: The resolution of this dispute has been hindered by father's repeated suggestions, including in briefing to this court, that aunt and uncle did something wrong (variously described as "kidnapping" and "hiding" E by father's attorney throughout these proceedings) when they took in E at the request of DHS. Clearly, aunt and uncle provided much-needed love, nurturing, and stability to E in a time of crisis. Such accusations are baseless and irresponsible—and incompatible with father's expressed commitment to work cooperatively with aunt and uncle—and any continuation of such statements can only be detrimental to E.[4]

With that caveat, we must conclude that, in the totality of the circumstances, aunt and uncle failed to rebut the statutory presumption that the legal parent acts in the child's best interests. We recapitulate our conclusions about each of the factors: First, although father has never had custody of the child, he is presently willing and able to adequately care for her. He lives in a stable home, is gainfully employed, and has experience caring for children. That weighs heavily in father's favor. Second, aunt and uncle have recently been the child's primary caretakers and have done a commendable job taking care of her. This weighs significantly in their favor. Third, the evidence that circumstances detrimental to the child exist if child is not placed with aunt and uncle is weak, adding little weight in favor of aunt and uncle. The evidence primarily concerns the strengths of aunt and uncle's home and their abilities to care for the child; there was little or no evidence that father's "*present* circumstances cause *present* detriment to the child." *O'Donnell-Lamont*, 337 Or at 112 (emphases in original). As to the fourth and fifth factors, the evidence establishes that, although father did not agree to the child's placement with aunt and uncle, he understands that she has a significant

---

[4] There is no evidence that father has ever expressed any animosity towards aunt and uncle, or made derogatory statements about them, in E's presence.

bond with them and will not sever her relationship with them. Thus, those factors weigh in father's favor.

In the totality of those circumstances, we conclude that the trial court erred in holding that aunt and uncle had rebutted the presumption that father acts in the best interest of the child.

The question of the scope of our remand remains. We determine that the circumstances here are strikingly similar, in some respects, to those in *Strome*. In the final paragraph of our opinion there, we observed:

> "While we recognize that appellate courts necessarily must review a record at a given point in time, we also understand that five years have passed since this case was decided in the trial court. During the pendency of appeal, the children have lived with their grandmother. Under these circumstances, we conclude that father is entitled to custody after a period of transition designed to ensure that the children's needs are best met. Accordingly, we remand the case to the trial court to establish an appropriate plan to transition the children to father's custody that includes ample contact between the children and grandmother."

201 Or App at 639 (citation omitted). *See also Dennis and Dennis*, 199 Or App 90, 104, 110 P3d 607 (2005).

As in *Strome*, we are mindful that E has lived with aunt and uncle since January 2005. She had just turned four; she is now nearly seven. E is, obviously, very closely attached to aunt and uncle. Accordingly, in these circumstances, as in *Strome*, "we conclude that father is entitled to custody after a period of transition designed to ensure that [E's] needs are best met," 201 Or App at 639, and we remand the case to the trial court "to establish an appropriate plan to [effectuate the transition of E] to father's custody that includes ample contact between" E and aunt and uncle. *Id.*

In A129927, reversed; in A129926, reversed and remanded with instructions to award custody to father.