Argued and submitted December 3, 2008, reversed and remanded
February 25, 2009

In the Matter of the Marriage of

Lauren Ann NGUYEN,
*Petitioner-Appellant,*

*and*

Jerry Duy NGUYEN,
*Respondent below,*

*and*

Paul MILLER
and Judith Miller,
*Intervenors-Respondents.*

Washington County Circuit Court
C014270DRC; A138531

203 P3d 265

Kimberly A. Quach argued the cause for appellant. On the opening brief were Mark Johnson and Johnson & Lechman-Su, PC. On the reply brief was Kimberly A. Quach.

Margaret H. Leek Leiberan argued the cause for respondents. With her on the brief was Jensen & Leiberan.

Before Landau, Presiding Judge, and Schuman, Judge, and Deits, Judge pro tempore.

SCHUMAN, J.

**SCHUMAN, J.**

Mother appeals a judgment granting custody of her child, T, to mother's parents.[1] The trial court initially concluded that neither mother nor father could adequately care for T and awarded temporary custody to grandparents, who at that time were witnesses at the custody hearing but not parties to the case. Six months later, the court granted grandparents' motion to intervene, finding that they had established the child-parent relationship that is a prerequisite to participating as third parties in a custody action. The court subsequently awarded grandparents sole legal and physical custody of T and gave mother and father each limited parenting time.[2] On appeal, mother assigns error to all of these outcomes, arguing, among other things, that the trial court erred in concluding that grandparents rebutted the statutory presumption that mother acts in T's best interest and therefore has a right to make decisions regarding his care and custody. Because we agree that grandparents did not rebut that presumption, we reverse and remand.

We recite the facts as we find them on *de novo* review, although we give considerable weight to the trial court's demeanor-based credibility determinations. ORS 19.415(3); *O'Donnell-Lamont and Lamont*, 337 Or 86, 89, 91 P3d 721 (2004), *cert den*, 543 US 1050 (2005). Mother and father married in 2000, shortly after the birth of their son, T, who was seven years old at the time of trial. Mother filed for dissolution in November 2001 and was appointed T's primary residential parent in the default dissolution judgment. During and after their marriage, father physically abused mother; after the marriage, he also stalked her. In part to escape that behavior, grandparents helped mother and T move to Guam in October 2004 and to Hawaii in May 2005. In October 2005, mother and T returned to Oregon and moved in with grandparents. Sometime in 2006, following an argument with grandmother, mother moved out, leaving T with grandparents. About two months later, mother obtained

---

[1] We refer to the parties from the perspective of T, that is, as mother, father, and grandparents.

[2] Father is not a party on appeal.

stable housing and T moved in with her. Grandparents continued to provide childcare while mother was at work. Mother eventually purchased a house near grandparents.

On July 8, 2006, mother was involved in an altercation with a former boyfriend, Morales, and was arrested. Morales had a criminal history, including involvement with a gang and dealing drugs. At the time of the altercation, mother was cooperating with law enforcement officers to facilitate Morales's arrest, and all charges against mother were eventually dismissed. A few days later, however, father sought and obtained an *ex parte* order granting him temporary custody of T, alleging that mother had been arrested, was abusing drugs, and had exposed T to domestic violence. Mother requested a hearing, at which father did not appear, and, on August 29, the court vacated the temporary custody order.

A hearing on father's motion to change custody occurred a few days later, in September 2006. At that hearing, father testified that mother was currently using methamphetamine on a daily basis, that mother was selling drugs, and that he was concerned that T would be exposed to domestic violence if mother reconciled with Morales. Grandmother, however, testified that, although mother was charged with a misdemeanor drug offense in 1998 and completed rehabilitation treatment at that time, she did not believe that mother was currently using drugs:

"[The Court]: [Do you have c]oncerns about your daughter using drugs?

"[Grandmother]: No.

"[The Court]: Why not? She was arrested for some stuff involving drugs; right?

"[Grandmother]: I think she has in the past. I don't think she is now.

"[The Court]: And why—what's different that makes you think that?

"[Grandmother]: I don't know. She just, you know, she's attending to [T] and taking care of, you know, leading the responsibilities, from what it appears to me."

The judge found grandmother's testimony credible, stating, "I absolutely believe what * * * grandmother has to say." He told father, however, "You lied. You're a liar. I just want to make sure you know that I know that you are a liar," and, "I'm finding that you are not a credible witness." Mother also testified and denied that she was using drugs.

At the end of the hearing, the judge told the parties,

"I'm real[ly] concerned about what's happened for this little guy, and I'm not satisfied that either one of these parents is in a position to really parent for him. * * * I'm going to take this case and I'm going to continue it for a period of time. I'm going to talk to DHS and see whether or not they're going to be involved * * *.

"We're going to place the child in * * * grandparents' home for right now.

"* * * * *

"And I can't trust [mother] to protect the child from [father]. I can't trust her to protect the child from bad boyfriends. I can't trust her to protect the child from herself. I don't know what in the world is going to be happening for this little kid. The only thing I know is that he's safe and secure with * * * grandparents * * *."

Mother's attorney did not lodge an objection to that ruling. He subsequently drafted the order granting grandparents temporary custody of T.

On February 23, 2007, grandparents filed a motion to intervene, seeking permanent custody of T. Grandparents noted, "While [T] has been in our care, we have provided his shelter, clothing, food, any medical attention he needed, purchased his toys and books, provided the funds for his entertainment and recreation and parented him including discipline and praise." The court granted grandparents' motion to intervene, concluding that "[f]or a period of more than six months * * * grandparents have provided for [T] and have had a parent-child relationship with [T]." The court also noted that DHS had declined to become involved in the case.

The final custody hearing occurred on November 20, 2007. Deputy Bowman, one of the officers involved in the incident between mother and Morales, testified that mother

had been cooperating with law enforcement officers to help capture Morales. He explained that mother was afraid of Morales and had obtained a firearm for protection. Because mother had a previous felony conviction, however, Bowman had cited her for felon in possession of a firearm. He also testified that the charge was reduced to a misdemeanor and might have been dismissed. Regarding mother's alleged drug use, Bowman testified as follows:

> "[Mother's Counsel]: Did you ever have concerns that [mother] was using drugs?
>
> "[Bowman]: We heard rumors and she's consented several times to search of her car and parts of her house, and I've never located drugs or seen her in possession of paraphernalia or anything like that.
>
> "* * * * *
>
> "[Mother's Counsel]: In your contact with her, have you ever had concerns that she's using methamphetamine or any other illegal drugs?
>
> "[Bowman]: No."

Guastadisegni, a court-appointed custody evaluator, submitted a detailed 42-page "Child Custody and Parenting Time Report" containing summaries of his interviews with and testing of father, mother, T, and grandparents, as well as his observations of mother interacting with T. He noted that T "seems well adjusted given the turbulence of his life," and that he had "a primary attachment to his mother. * * * This is a strong attachment that goes beyond his social and functional (*e.g.*, day to day) needs." He reported that T was doing well in school and that grandparents reported "no major behavioral concerns." He also observed that mother's interaction with T seemed strained, but suggested that the cause of that strain was mother's awareness that she was being observed. He summarized his impressions as follows:

> "I have major concerns for [T]. There is no question that [grandparents] are the most stable of the three options to provide a home environment for [T] at this time. However, that does not mean that they should have custody. It is true that [mother] has had some major setbacks in her life and she did not do a good job of prioritizing for the needs of [T]. She encountered significant disruption in her personal life

and this directly affected her son. However that does not mean she should have her parental rights usurped. * * *

"* * * * *

"At the present time I would recommend that the court consider a temporary guardianship for [T] with [grandparents], with the explicit goal of returning [T] to [mother] as the primary custodial parent in the future. I believe this arrangement will ultimately serve [T's] best interests."

(Underscoring in original.) He recommended that, before allowing T to return to mother, the court should require that she successfully achieve several benchmarks.

At trial, Guastadisegni's testimony was consistent with his report. He testified that mother "has been the primary caregiver figure, and * * * for the first six years [T has] been primarily with her." (T was seven years old at the time of trial.) He did not believe that mother had ever physically abused T, but noted that she had been neglectful of his needs, citing a history of domestic violence between mother and father and between mother and Morales; a history of residential instability; and allegations of drug use. Guastadisegni reported that mother had taken a plea bargain for a forgery charge before T's birth and had been charged with possession of methamphetamine and driving under the influence of intoxicants, but that mother claimed that all charges against her were misdemeanors and had been expunged. The record does not disclose whether that is accurate. He also noted that mother denied current drug use, and that he had heard only one third-hand account of mother's drug use and did not know when that alleged use supposedly occurred. Guastadisegni reported that mother had previously been diagnosed with attention deficit hyperactivity disorder (ADHD) and post-traumatic stress disorder (PTSD), although he noted, "I would question the ADHD diagnosis in [mother]." He stated, "I did not diagnose her with a personality disorder. I diagnosed her, though, with having personality traits of dependency and antisocial personality traits as well."

Regarding mother's present fitness to serve as T's parent, he stated at one point, "Today I would say no." He also testified as follows:

"[Mother's Counsel]: Okay. And if I understand your testimony, you're not saying that [mother] is not minimally fit?

"[Guastadisegni]: No, I'm not saying that. I think she needs the services recommended and I think she needs time to do that, and I think she would be adequate to parent [T].

"[Mother's Counsel]: * * * Do you think it would be in [T]'s best interests to be removed from the care of his mother * * *?

"[Guastadisegni]: I think it would be in the best interests of [T] to be with his mother as long as she can make the necessary changes and provide stability and consistency, because he's primarily attached to her. And I think that relationship is a healthy one. But if the patterns of behaviors that she demonstrated in the past were to continue to resurface, then he would be better off [with grandparents] * * *."

When asked if he believed T would be safe if he stayed overnight for several days with mother, Guastadisegni stated, "I do believe that [mother] would be safe and that she wouldn't put [T] at risk."

The judge, however, awarded sole legal and physical custody of T to grandparents and made the following findings:

"(a) Since September 7, 2006, [grandparents] have been [T]'s primary caretakers;

"(b) Information before this court, including the testimony of [Guastadisegni], shows by a preponderance of the evidence that neither Mother nor Father is presently able to care adequately for [T], and that circumstances detrimental to [T] exist if [grandparents] are not granted custody of him;

"(c) Neither parent has unreasonably denied or limited contact between [T] and [grandparents]; therefore

"(d) It is in [T]'s best interest that sole legal and physical custody be awarded to [grandparents], who have established a child-parent relationship with him * * *."

The judgment allowed mother limited unsupervised parenting time with additional visitation after two months if she

completed a list of conditions, including keeping stable housing, not possessing firearms, not using drugs or alcohol within 24 hours of parenting time, not involving herself in violent relationships, not associating with known criminals or substance abusers, attending parenting and domestic violence education classes, and participating in mental health therapy.

ORS 109.119 establishes the conditions and procedures governing third-party custody. That statute permits a nonparent "who has established emotional ties creating a child-parent relationship" to petition a court for custody, guardianship, or visitation rights with a child. ORS 109.119(1), (3). A "child-parent relationship" is defined, in part, as

"a relationship that exists or did exist, in whole or in part, within the six months preceding the filing of an action under this section, and in which relationship a person having physical custody of a child or residing in the same household as the child supplied, or otherwise made available to the child, food, clothing, shelter and incidental necessaries and provided the child with necessary care, education and discipline, and which relationship continued on a day-to-day basis, through interaction, companionship, interplay and mutuality, that fulfilled the child's psychological needs for a parent as well as the child's physical needs."

ORS 109.119(10)(a). In order for nonparent petitioners to gain custody, they must overcome "a presumption that the legal parent acts in the best interest of the child." ORS 109.119(2)(a). ORS 109.119(4)(b) describes how the presumption may be rebutted:

"In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award custody, guardianship or other rights over the objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A) The legal parent is unwilling or unable to care adequately for the child;

"(B) The petitioner or intervenor is or recently has been the child's primary caretaker;

"(C)   Circumstances detrimental to the child exist if relief is denied;

"(D)   The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

"(E)   The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."

ORS 109.119(10)(b) clarifies that " 'circumstances detrimental to the child' includes but is not limited to circumstances that may cause psychological, emotional or physical harm to a child." The court must find "by a preponderance of the evidence," ORS 109.119(3)(a), that the presumption has been rebutted in order to grant custody to a nonparent over a legal parent's objection. Finally, if the nonparent has established a child-parent relationship and overcome the presumption in favor of the legal parent, ORS 109.119(3)(a) provides that the court shall grant custody to the petitioner only "if to do so is in the best interest of the child."

■      In her first three assignments of error, mother argues that the trial court erred in finding that grandparents had established a child-parent relationship with T. She contends that the court erred, first, in giving grandparents temporary custody at the September 7, 2006, hearing, where they were not parties and did not request custody; second, in relying on the relationship that developed during that (allegedly) unlawfully obtained temporary custody as the basis for determining that grandparents had established the requisite child-parent relationship; and third, in finding that the relationship that developed met the statutory definition of "child-parent relationship." Mother's three remaining assignments of error relate to the court's final custody order. She argues that the court erred, first, in concluding that grandparents rebutted the statutory presumption that she acts in T's best interest; second, in awarding custody of T to grandparents; and third, in failing to adopt the custody evaluator's recommendation of more extensive parenting time. We agree with mother that, even if we were to presume for the sake of argument that grandparents validly established a child-parent

relationship, grandparents did not overcome the presumption in mother's favor and, consequently, the court erred in awarding custody to them instead of to mother. We therefore need not and do not address the other assignments of error.

■     In determining whether grandparents overcame the statutory presumption in favor of mother, we consider the rebuttal factors in ORS 109.119; although those are not the only factors that we can consider, the parties have not suggested others and we have not found any that are relevant. "In specific cases, the weight to be given to each of the five statutory factors, to the evidence supporting those factors, and to other relevant evidence, will vary." *O'Donnell-Lamont*, 337 Or at 108. Our focus "is not on whether one or more of the statutory factors are present, but on whether the evidence as a whole is sufficient to overcome the presumption that the parent acts in the best interest of the child." *Id.* at 109. We consider each factor in turn.

The first—and, at least in this case, the most important—factor is whether the "legal parent is unwilling or unable to care adequately for the child." ORS 109.119(4)(b)(A). In *O'Donnell-Lamont*, the court emphasized that

> "consideration of this factor does not allow the court to substitute its judgment for that of a parent by determining that the nonparent is *better* able to care for the child. The legislature's use of the word 'adequate' suggests that the parent must have the willingness and ability to provide something more than a bare subsistence level of care for the child, but that it would be inappropriate to compare a parent's 'adequate' care with a nonparent's 'more than adequate' care in considering this factor."

337 Or at 110 (emphasis in original). Thus, in *Muhlheim v. Armstrong*, 217 Or App 275, 282, 286, 175 P3d 521 (2007), *rev den*, 344 Or 558 (2008), the father's criminal history, including convictions for felony eluding a police officer and misdemeanor battery, was "hardly laudatory, [but] not so extensive or egregious to suggest that he is currently unable to be an adequate parent." In *Muhlheim*, the only evidence in the record that related to the father's alleged substance abuse was conviction for possession of less than an ounce of marijuana, which occurred before the child was born, and driving under

the influence of intoxicants. The court concluded that, "[a]lthough those circumstances may well indicate that [the] father had, or may even continue to have, issues involving substance abuse, they come nowhere near establishing that he has substance abuse problems that rise to the level of making him currently unable to adequately care for a child." *Id.* at 286; *accord Strome and Strome*, 201 Or App 625, 629-30, 633, 120 P3d 499, *rev den*, 339 Or 701 (2005) (the father's "past inadequacies as a parent"—including limited involvement with the children, yelling at them and calling them obscene names, taking drugs, and working as an escort—did not establish that he was unwilling or unable to care for the children at the time of trial).

In the present case, Guastadisegni determined that mother was unable to parent T because she "has been historically unstable," citing drug abuse, domestic violence, residential instability, and her criminal record. Grandparents also cite mother's "significant mental problems" and involvement with gang members. Regardless of whether mother was "historically unstable," however, we conclude that grandparents did not show by a preponderance of the evidence that mother was *currently* unable or unwilling to adequately parent T. Father's testimony was the only evidence that mother was currently using drugs, and the judge stated in emphatic terms that he was not a credible witness. Grandmother, whom the judge found highly credible, testified that she did not believe that mother was currently using drugs. Bowman testified that, in his contacts with mother, he had never seen drugs or drug paraphernalia, and he did not have any evidence of or concerns about drug use. Allegations that mother was currently exposing T to domestic violence or to known gang members are similarly unsubstantiated on the record; mother obtained a restraining order against father and testified that she continued to see him only because the court awarded him temporary custody of T, and father's testimony was the only evidence suggesting that mother might continue to date Morales. Nothing in the record suggests current residential instability; in fact, mother purchased a house before the final custody hearing.

Further, the record is unclear regarding mother's criminal history. Mother told Guastadisegni that her prior

convictions were reduced to misdemeanors and expunged; Bowman testified that he was unclear whether the citation for felon in possession of a firearm was dismissed, and grandparents, who had the burden of proving unfitness, produced no evidence that it had not. In any event, although grandmother alluded to mother's criminal convictions, it is unclear whether any of them occurred after T's birth. Finally, Guastadisegni's statements that mother had "traits of dependency and antisocial personality traits" and was previously diagnosed with ADHD and PTSD are insufficient to establish that mother cannot care for T, in the absence of evidence demonstrating that those traits or diagnoses affect her ability to parent and given his statement that he "would question the ADHD diagnosis in [mother]." That conclusion is fortified by Guastadisegni's observation that T was doing well in school and that grandparents reported "no major behavioral concerns." The evidence therefore does not support the trial court's conclusion that mother was presently unable to care adequately for T.

The second rebuttal factor is whether grandparents have shown that they "[are] or recently [have] been the child's primary caretaker[s]." ORS 109.119(4)(b)(B). "This factor focuses on the interest in continuity of caregiving and the relationship between the child and the nonparent seeking custody." *O'Donnell-Lamont,* 337 Or at 111. In the present case, grandparents became T's primary caretakers when they were awarded temporary custody on September 7, 2006. Guastadisegni testified, however, that, before grandparents were awarded temporary custody, mother was "the primary caregiver figure, and * * * for the first six years [T has] been primarily with her." Because both mother and grandparents recently had filled the primary caretaker role for T, we give this factor little weight. *See Wilson and Wilson,* 199 Or App 242, 251, 110 P3d 1106 (2005) (concluding that, where the parties previously shared custody and were both involved with the children, this factor "does not carry significant weight").

The third rebuttal factor is whether "[c]ircumstances detrimental to the child exist" if the nonparent is not awarded relief. ORS 109.119(4)(b)(C). Such circumstances include, but are not limited to, "circumstances that may

cause psychological, emotional or physical harm to a child." ORS 109.119(10)(b). A nonparent must show that the "circumstances of living with the legal parent pose a serious *present* risk" of such harm; it is not enough to show that living with a legal parent *may* cause such harm. *O'Donnell-Lamont*, 337 Or at 112-13 (emphasis added). Although a parent's frequent change of residences does not, by itself, show "circumstances detrimental to the child," when the parent "chooses to move often not because of employment or other external considerations but simply because of a desire to move, and the parent fails to consider the impact of the moves on the child, those moves can be relevant" to our determination. *Id.* at 115.

In the present case, as discussed above, most of the evidence weighing against mother's ability to parent T had to do with whether she was "historically unstable," rather than whether her custody of T posed a serious *present* risk of harm to him. Evidence that mother previously abused drugs, exposed T to domestic violence, or had a criminal record, in the absence of evidence of a present risk of harm, is insufficient to establish circumstances detrimental to the child. *See Strome*, 201 Or App at 634-35 ("In the absence of evidence that father's drug use has continued into the present, * * * we cannot conclude that father's past substance abuse poses a serious present risk of psychological, emotional, or physical harm."). Further, the evidence suggests that mother's previous residential instability was due, at least in part, to her efforts to escape abuse by father. And finally, we note that there is no evidence that T has suffered any detrimental effects from mother's conduct. Grandparents and the teacher whom Guastadisegni interviewed testified that he has no significant problems. We conclude that grandparents did not establish by a preponderance of the evidence that circumstances detrimental to T exist if grandparents are not awarded relief.

The fourth rebuttal factor is whether the "legal parent has fostered, encouraged or consented to the relationship between the child and the [nonparent]." ORS 109.119(4)(b)(D). If the legal parent has fostered such a relationship, a court may infer that "the legal parent, at least at one point, apparently believed that that relationship was

beneficial, or at least not detrimental, to the child." *O'Donnell-Lamont*, 337 Or at 115. In the present case, the evidence shows that mother fostered such a relationship between grandparents and T, leaving T with grandparents for approximately two months until she obtained stable housing and relying on grandparents for work-related child care. However, we give this factor little weight because, under the circumstances of this case, "the fact that [mother] consented to grandparents serving as primary caregivers and otherwise having a close relationship with [T] does not indicate in any way that [s]he does not act in the best interests of the [child]." *Id.* at 115-16.

■ The final rebuttal factor is whether the "legal parent has unreasonably denied or limited contact between the child and the [nonparent]." ORS 109.119(4)(b)(E).[3] In addressing this factor, we may consider whether a parent will, in the future, unreasonably restrict or preclude contact between a child and the nonparent. *Muhlheim*, 217 Or App at 289. In the present case, mother purchased a house near grandparents' home and has historically relied on grandparents for childcare. On this record, we find no indication that mother ever denied or limited T's contact with grandparents, and no reason to suggest that she might. We therefore conclude that grandparents failed to establish by a preponderance of the evidence that mother has or will unreasonably restrict contact between T and grandparents.

We conclude that, under the totality of the circumstances, grandparents have not rebutted the statutory presumption that mother acts in the best interest of T, and that mother therefore cannot be deprived of custody in favor of grandparents. The question of the scope of our remand remains. In *Strome*, we observed:

"While we recognize that appellate courts necessarily must review a record at a given point in time, we also understand that five years have passed since this case was

---

[3] We note that the fourth and fifth rebuttal factors appear to be in conflict with each other, or at least to put a parent who is involved in a third-party custody dispute in a difficult position. If the parent encourages a relationship between the third party and the child, that encouragement works against the parent under the fourth factor; if the parent discourages the relationship, that works against the parent under the fifth factor.

decided in the trial court. During the pendency of appeal, the children have lived with their grandmother. Under these circumstances, we conclude that father is entitled to custody after a period of transition designed to ensure that the children's needs are best met. Accordingly, we remand the case to the trial court to establish an appropriate plan to transition the children to father's custody that includes ample contact between the children and grandmother."

201 Or App at 639 (citation omitted). In the present case, T has been in grandparents' care since September 2006. Indeed, mother acknowledges that a period of transition, as Guastadisegni recommended, is appropriate. Therefore, as in *Strome*, "we conclude that [mother] is entitled to custody after a period of transition designed to ensure that [T's] needs are best met," and we remand the case to the trial court "to establish an appropriate plan to [effectuate the transition of T] to [mother's] custody that includes ample contact between" T and grandparents. *Id.* That plan may contain specific conditions for mother to meet, as Guastadisegni recommended and the trial court originally imposed.

Reversed and remanded.